ATTORNEY GENERAL *vs.* NATHAN A. TUFTS.

June 10, 1921. — June 21, 1921.

Present: RUGG, C. J., CROSBY, PIERCE, CARROLL, & JENNEY, JJ.

July 11–August 11, 1921. — October 1, 1921.

Present: RUGG, C. J., BRALEY, CROSBY, CARROLL, & JENNEY, JJ.

*District Attorney. Supreme Judicial Court. Constitutional Law,* Impeachment of public officer. *Public Officer. Practice, Civil,* Exceptions. *Evidence,* Remoteness, Relevancy and materiality, Privileged communications, Presumptions and burden of proof. *Conspiracy. Words,* " Officer . . . of the Commonwealth."

A district attorney is not an "officer . . . of the Commonwealth" within the meaning of those words as used in c. 1, § 2, art. 8 of the Constitution of the Commonwealth.

The provisions of G. L. c. 211, § 4, are constitutional.

The full court of the Supreme Judicial Court has jurisdiction under G. L. c. 211, § 4, to hear and determine an information by the Attorney General charging, with specifications, that the public good of the Commonwealth requires the removal from his office of a certain district attorney because he has been guilty of malfeasance, misfeasance and nonfeasance in his office, has conducted himself therein in an unlawful and reprehensible manner, and is an unfit person to hold the office, and praying for his removal.

The district attorney, who was the respondent in the proceeding above described, had been elected for and had served one full term and immediately was re-elected and was serving his second term when the proceeding was begun.  The respondent moved that the scope of the hearing of the proceeding upon its merits be limited to acts and omissions of the respondent following his second election. *Held,* that

(1) Acts or conduct of the respondent during his first terms of office might be such as to constitute "sufficient cause" for, and to make it appear "that the public good" required, his removal from office;

(2) The single circumstance of a re-election was not enough to prevent inquiry into the respondent's acts and conduct during his first term of office;

(3) The motion was denied.

The respondent in the proceeding above described moved that the scope of the hearing of the proceeding upon the merits be limited " to acts and omissions alleged to have been committed or omitted by " the respondent in and concerning the office of district attorney and affecting the proper administration of that office. *Held,* that

(1) Wrongs which render a man unfit to hold the office of district attorney need not be committed in the immediate performance of, but may arise wholly outside, his official duties;

(2) The motion was denied.

The great powers and grave responsibilities of the office of district attorney demand that an incumbent of that office be of a character incorruptible, a reputation unsullied, a high standard of professional ethics and sound judgment of no mean order.

The office of district attorney is a public trust and the incumbent should not be permitted to treat it as his selfish affair.

At the hearing upon the merits of a proceeding under G. L. c. 211, § 4, seeking the removal of a district attorney, the sole matter for inquiry is the public welfare as affected by the moral, intellectual and professional characteristics and conduct of the respondent.

While, in such a proceeding, neither an isolated act of malfeasance by the respondent which did not show a corrupt or depraved disposition and which was outside his pending term of office or had no relation to his official duties, nor misdeeds or lapses for which expiation had been made by established uprightness and integrity would justify his removal from office; on the other hand, if his character be shown to be bad, his sense of moral fitness blunted, or if in other respects his behavior is offensive to the right-minded so that public confidence

in the purity and impartiality of his official work is justly shaken, "sufficient cause" for removal is shown.

In a proceeding under G. L. c. 211, § 4, no exception can be entertained.

At an inquest, under the provisions of G. L. c. 211, § 4, into the official rectitude and general qualifications to hold the office of district attorney of an incumbent of that office, communications and conversations between the respondent and persons, who, fearing that they might be accused of crime, went to show themselves to him and if possible to avert the apprehended prosecution, are not inadmissible as evidence by reason of their being privileged, the Commonwealth, speaking through that statute, having waived whatever privilege it might have had in order that there may be full investigation into the propriety from the standpoint of the general welfare of permitting one of its officers to continue to conduct its business.

At the hearing of proceedings instituted by the Attorney General under G. L. c. 211, § 4, making charges against the incumbent of the office of district attorney of the northern district and seeking his removal, in view of the charges made and of the fact that there was no allegation that the respondent had appointed incompetent or corrupt assistants or knowingly had retained such assistants in office or had organized his office in such a way as to be inefficient or corrupt in its management and disposition of cases, the mere fact that assistants of the respondent placed cases on file or made entries of *nolle prosequi*, unless accompanied by evidence that such action was either in general or in particular authorized by the respondent, was *held* in the circumstances to be incompetent.

The question, *whether* an assistant district attorney has authority to make an entry of *nolle prosequi*, or whether that power can be exercised only by the district attorney himself, was not decided.

At the hearing above described, evidence, tending to show that the institution of the proceedings was inspired by political and personal motives and not by regard for the public weal, was excluded as irrelevant and immaterial.

Opinion evidence, tending to show that conditions relating to the protection of life and property in the northern district had been better during the administration of the office by the respondent than they were before, was excluded, at the hearing above described, as irrelevant.

Opinion evidence, at the hearing above described, tending to show that the respondent had appeared to be a faithful and efficient officer, was excluded as irrelevant and immaterial.

While a conspiracy must be a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means, it is not necessary that all the conspirators join in every part of the unlawful transaction.

The motives by which the several persons engaged in an unlawful conspiracy are actuated may be most diverse, and the part each is to play, the reward or satisfaction to be received by each, and the knowledge possessed by each of the scope and details of the affair may be widely at variance.

A conspiracy may exist even though the purposes of the participants or of some of them may not be discoverable by the means open in the trial of causes.

It is not essential to a conspiracy that the parties meet or that they confer and formulate their plans: common purpose may be inferred from concerted action converging to a definite end.

Upon the hearing of the charges made by the Attorney General in the information and specifications in the proceedings above described concerning conduct of the respondent relating to the return to the State prison of a convict, who, while undergoing a sentence there for manslaughter committed in Suffolk County, had escaped, it was *held,* that

(1) It was a breach of duty in the respondent, having come to the aid of a Newton police officer and undertaken the direction of the movements of the officer and himself and being of the two the person of far higher official position and greater responsibility, to permit the escaped convict, after having voluntarily come into his automobile, for a considerable period again to depart in freedom with every opportunity to escape;

(2) The conduct of the respondent in personally participating in the effort to apprehend the fugitive, whatever may have been the motive actuating him, manifested bad judgment in one holding the office of district attorney in a district where neither the original crime for which the fugitive was serving sentence nor the subsequent crime of escape from the State prison was committed;

(3) The respondent, in a deliberate statement given to the public press after the delivery of the fugitive to State authorities, voluntarily, intentionally, intelligently and deliberately told falsehoods concerning the apprehension of the fugitive which revealed a lamentable want of appreciation of moral values and disclosed either entire ignorance or wanton disregard on his part of the fundamental obligation of a public officer to tell the truth when he speaks, which obligation is most stringent upon a district attorney;

(4) For pretended, flimsy and unworthy reasons, the respondent improperly refused to give to the commissioner of the department of corrections the true facts relating to the apprehension of the fugitive;

(5) The respondent voluntarily and admittedly violated St. 1918, c. 259, § 6, in falsely registering a police officer in a hotel while negotiating for the return of the fugitive;

(6) A district attorney ought not to set an example of disobedience to a penal statute;

(7) The respondent's opinion that it was wiser for the police officer not to be registered under his own name was no excuse;

(8) The finding on the charge of violation of St. 1918, c. 259, § 6, standing alone, would not be regarded as sufficient ground for removal of the respondent under the statute; and the final order does not rest on such finding.

Upon the hearing of evidence relating to charges made by the Attorney General in the information and specifications in the proceedings above described, that the respondent and a former district attorney and an attorney at law, with others to the informant unknown, formed a conspiracy to extort $100,000 from some men of great wealth by threats of indictment by reason of their participation in an orgy of drink and lust at a bawdy house called Mishawum Manor on May 7, 1917, it was *held,* that

(1) This court was not concerned in this proceeding with the financial transactions between the alleged victims of the conspiracy and their attorneys or any of them, except as such transactions threw light on the charges against the respondent;

(2) The conduct of the respondent was blameworthy, in that, if he thought a basis existed for prosecution of the alleged culprits, he utterly failed to perform his duty with the known material at hand and, if he did not think such basis

existed, he acted toward some, if not all, of the counsel for those men as if he thought there was such a basis and intended to institute prosecutions; and in that he failed to use proper efforts for the conviction and sentence of the proprietor of the bawdy house;

(3) The course of conduct of the respondent throughout this transaction was that which would have been adopted and followed by an astute and cunning district attorney, who was an accomplice in a conspiracy designed to separate the great sum of money from men of wealth, timid about further notoriety concerning their participation in a disreputable affair. *Whether* he was thus guilty need not be determined in the present case;

(4) The respondent was guilty of wilful misconduct in the performance of his duties in the particulars set forth in these charges.

The proprietor of Mishawum Manor was afterwards apprehended under a different name upon a complaint charging a similar crime in another city in the respondent's district, and this court *held,* that the respondent either knew or ought to have known that she was the woman who previously had been apprehended as the proprietor of Mishawum Manor, and that in the circumstances he was guilty of neglect of duty without adequate excuse in refusing to cause a capias to be issued for her appearance after her default on the subsequent complaint.

The ordinary duty of a district attorney, when an indictment has been found, is to cause every reasonable effort to be made to have the defendant appear forthwith before the court, either voluntarily, through arrest, or otherwise, and to plead to the indictment, or else to make an entry of *nolle prosequi* as to the indictment, and, during a reasonable time while the person indicted is being sought and his arrest accomplished, it is proper that the indictment be kept secret; but, after arrest and arraignment are feasible, the indictment should be kept secret no longer.

Upon the hearing of the proceeding above described, it was *held* that the respondent improperly had failed to cause certain persons, against whom the grand jury had found and returned secret indictments, to be apprehended and arraigned, or to make any effort to cause their apprehension although they were within the Commonwealth.

Upon the evidence relating to a paragraph, with specifications, in the proceedings above described, charging that the respondent from improper motives had made entries of *nolle prosequi* and had recommended to the court for filing cases in which there should have been prosecutions, it was found in substance that, being informed by a captain of police, who was acting in conjunction with a private detective, of evidence tending to show that a certain man and a certain woman were guilty of adultery, and when there was to be no session of the grand jury for six weeks, the respondent did not cause the man and woman to be brought forthwith into the local district court, but let them remain at large until the next sitting of the grand jury, when he had them indicted; that the woman never was arrested nor brought into court; that the man pleaded not guilty, then changed his attorney; that the respondent had become incensed with the man's former attorney; that thereafter requests, which the respondent had refused to the man's former attorney, were granted when they were made by the second attorney, to whom the man paid over $12,000, and the respondent thereafter entered a *nolle prosequi* as to the man. *Held,* that

(1) The conduct of the respondent was reprehensible;

(2) The respondent failed in the performance of his duty by not having the

parties arrested and heard in the local court and adequate security given for their appearance when required;

(3) While the only finding made as to the respondent's motive was in substance that he became incensed against the attorney who first represented the indicted man, his conduct of the affair was incompatible with a proper administration of his office;

(4) The administration of the criminal law ought not to be open to the just imputation or the strong suspicion of being conducted on the footing of special favors;

(5) While a district attorney is human, he ought not to visit upon defendants the bad feeling or lack of confidence which he entertains toward their counsel.

Upon the evidence relating to a charge, in the proceedings above described, relating to prosecution of a criminal charge for maintaining a gaming nuisance of a flagrant character, it was found that, after a recommendation by an assistant of the respondent that only a fine of $100 be imposed upon the defendant had been denied by a judge of the Superior Court, another assistant presented the matter to a different judge without stating the action of the first judge and when the agent of a society which had investigated the case was not present, and the recommendation was adopted. No improper motive on the part of the respondent was found, but it was *held*, that the course of conduct was highly improper.

Upon the evidence relating to a charge, in the proceedings above described, that the respondent from improper motives had failed and refused to prosecute an indictment against a former police officer for receiving a stolen automobile, it was found that the indictment was returned on April 1, 1919; that the evidence was ample to warrant conviction; that an inspector of police, who had investigated the case and had gathered the evidence, several times had asked the respondent for a capias for the defendant's arrest, which the respondent had refused; that the defendant was not a fugitive from justice; that the defendant then committed another offence of a similar nature, and the respondent ordered his arrest on July 15, 1920; that he was indicted after the second offence in September, 1920, and that, when a special assistant attorney general took charge of cases of that nature in the respondent's district, the defendant pleaded guilty to both indictments, the first was placed on file and on the second he was sentenced to two years in the house of correction. In attempting to explain his conduct in a campaign for re-election, the respondent made false statements to the public. *Held*, that there was no justification for the respondent's failure to arrest the defendant within a reasonable time after the first indictment and to bring him to trial if he had not pleaded guilty.

Upon evidence relating to a charge, in the proceeding above described, that, with witnesses at hand or available, the respondent had withheld evidence from the grand jury and thus had failed in his public duty, it was found that a prisoner in the house of correction alleged that he had been approached by public officials with an offer to procure his release for $1,000, that he had paid the money and that after a time it had been returned to him. His accusations implicated the respondent. The matter was investigated both by the office of the Attorney General and by the office of the respondent. The respondent personally presented the matter to the grand jury, himself testifying. Material evidence was not produced. *Held*, that

(1) The matter was not thoroughly presented to the grand jury;

(2) In the circumstances, the respondent showed conspicuous want of appreciation of official propriety in testifying;

(3) In the circumstances, the respondent ought not himself to have presented the evidence;

(4) The charge was sustained.

Upon the evidence relating to a charge, in the proceeding above described, that the respondent had entered into a conspiracy with certain persons, who were not named, to secure the commission of crime by a certain man in order to enable his wife to obtain a divorce on the ground of adultery, it was *found* and *ruled* that

(1) The woman consulted the respondent at his office in the court house, narrated her matrimonial difficulties, and discussed evidence of her husband's wrongdoing. The respondent advised her that she had no present evidence sufficient to procure a divorce, but suggested a scheme whereby the husband in a distant city might be entrapped into committing adultery through the instrumentality of a harlot of attractive appearance who should go to a hotel near him and there entangle him in an unlawful intimacy, and that arrangements could be made for private detectives to be at hand at an appropriate moment to identify the husband under compromising circumstances. The expense of carrying out such a plan, the financial resources of the husband, the state of title of real estate of the wife and other matters were discussed. The respondent said that by reason of his official position as district attorney he could not undertake an affair of that sort and that his name must not be mentioned, although he might be of assistance by intimating to the husband, if he should be brought before him, that he was sorry, but that, by making it worth while to his wife, it would be all right;

(2) Soon after the interview with the respondent, the woman consulted the attorney at law who had been most prominent in the Mishawum Manor case, above described;

(3) Within a comparatively short time after the conversation, a woman, then a stranger to the husband, obtruded herself upon his attention in the distant city, ingratiated herself into his favor and stimulated his lust to carnal fruition at an apartment in Cambridge two months later, which was interrupted by the appearance of two men who entered through unlocked doors and suggested that the husband communicate with their employer, the lawyer whom the wife had consulted after her interview with the respondent. All this was done with the deliberate purpose according to a premeditated design to ensnare the husband in adulterous conduct in aid of securing a divorce for the wife;

(4) The plans outlined by the respondent in his interview with the wife were carried into execution through the co-operation of several persons or the co-ordination of several persons under the domination of one resourceful director;

(5) While there was no evidence to show that the respondent himself managed the execution of the plan, such a train of circumstances would not arise by chance;

(6) The respondent was guilty as charged.

While there is no statute prohibiting a district attorney from undertaking the defence of those charged with crime outside his own district, or in sharing in the profits of such defence by those who are his partners, there is a certain want of decorum in so doing and a keen sense of official propriety would prevent a district attorney from engaging in such practice.

It *was said* that, for a district attorney or any one connected with his office to receive

and disburse moneys paid by indicted defendants for restitution or reparation, is vicious.

The respondent in the proceeding above described was found to have been derelict in his duty in not prosecuting one who had been guilty of procuring possession by a barefaced fraud of practically all the property of a woman, amounting to over $10,000.

Upon the evidence as to a charge in the proceedings above described, that the respondent conspired with certain attorneys at law and a captain of the police at Cambridge to extort money from a certain Massachusetts corporation and some of its officers and that, pursuant thereto, by making and inducing threats of criminal prosecution and through menace and fear thus exerted, he caused the payment by them of $7,500 to one of the attorneys, it was found that, while the evidence was not sufficient to warrant a finding that a conspiracy was formed and executed as alleged, nevertheless the respondent had failed in the maintenance of the official standards which ought to prevail in that, after he had made a threat of an investigation by the grand jury to an attorney who first represented the corporation, he stopped all inquiry on the subject at the request of another attorney who subsequently represented it, a large sum of money having been paid by the corporation to the second attorney ostensibly by way of fee.

In making the foregoing findings, this court gave due weight to all the presumptions of uprightness and rectitude which commonly characterize the conduct of men in public stations.

Upon the foregoing findings and rulings, it was found to be clear beyond doubt that the character and the official conduct of the respondent rendered him unfit to hold longer the office of district attorney and it was ordered that he " do not in any manner concern himself further about the holding of or exercising the " office of district attorney, " but that he be and is hereby removed therefrom, and forejudged and excluded from holding or exercising the said office."

INFORMATION, filed by the Attorney General on May 25, 1921, under G. L. c. 211, § 4, and supported by affidavits of the Attorney General and of Henry F. Hurlburt, Esquire, Special Assistant Attorney General, containing allegations which, as amplified by specifications afterwards filed, were in substance as follows:

Nathan A. Tufts on November 7, 1916, was elected a District Attorney for the Northern District of the Commonwealth, qualified as such on January 3, 1917, and thereafter continued in that office. He was again elected to that office on November 4, 1919, and on January 7, 1920, qualified and had thereafter been and then was holding that office. From that office the informant alleged that the public good of the Commonwealth required that the respondent be removed, setting forth acts and doings " of said District Attorney" since January 3, 1917, and continuously down to the filing of the information, which were alleged to show him to be unfit to hold that office, in that, since January 3, 1917, he had been guilty of malfeasance, misfeasance and nonfeasance in his office,

and had conducted himself therein in an unlawful and reprehensible manner, and was an unfit person to hold the office, specifications being as follows:

1. On May 30, 1920, one Herman L. Barney, then confined and undergoing a sentence for the crime of manslaughter in the State prison at Charlestown in Suffolk County, escaped. Between May 30 and June 5 he remained in concealment in the vicinity of Cambridge and was in conference with one Stephen Bresnahan, a member of the bar. On June 5, he appeared at the house of a former schoolmate in Northampton and from that date until his return to the State prison he remained in concealment. Between June 5 and June 13, he was in correspondence with persons in Cambridge, one of them being Mr. Bresnahan. After June 13, Edward P. O'Halloran, who was then a police inspector of Newton, communicated with the respondent concerning the whereabouts of Barney, giving him information thereof. On June 28 and previous thereto, the respondent knew of the whereabouts of Barney and that he was in concealment in or near Northampton, and then knew or could have known that Barney could be apprehended, and also that the police and State officers and officials of the State prison, whence Barney had escaped, and other officers and officials of the Commonwealth, were seeking information as to Barney's whereabouts and endeavoring to secure his apprehension; yet the respondent, with the information that he had as to the whereabouts of Barney, withheld all information from such public officials, thereby impeding the public officials in their lawful effort and duty to apprehend Barney and giving him an opportunity to flee from the State and escape and avoid apprehension.

2. The respondent entered into, and knowingly permitted persons acting in his behalf and by his authority to enter into negotiations, arrangements, and agreements with Barney, who was then at large though secreted within this Commonwealth, by virtue of and as a result of which the respondent intended to derive personal benefits and advantages in the event that he was able to secure the return to prison of Barney; and as a consideration for the voluntary surrender to him of the fugitive Barney pending the consummation of the negotiations, arrangements, and agreements, assurances were given and communicated by the respondent to the fugitive, whereby the fugitive was promised and assured that if he would

surrender to the respondent, the respondent would cause favorable action to be taken in behalf of the fugitive which would inure to his benefit and advantage; that the respondent, while conspiring with divers other persons to secure the voluntary return of Barney and pending the acceptance by the fugitive of the promises and proposals of negotiations, arrangements, and agreements so made and communicated to the fugitive, did, in fact, afford opportunity to the fugitive to evade arrest or apprehension and escape from the Commonwealth, unless the fugitive should voluntarily accede to the terms and proposals so communicated to him; whereby, and by virtue of the collusive arrangement between the respondent and persons in conspiracy with him and the fugitive, the respondent collusively and unlawfully aided and abetted and participated in the concealment of the fugitive, and thereby aided and abetted the fugitive in his concealment and in his evasion of apprehension and arrest, whereby and by virtue of such acts of the respondent in conspiracy and in collusion with divers other persons, the respondent did enter into and permit considerations, promises, and assurances of benefit, advantage, and protection to the fugitive to be communicated to the fugitive as consideration for his yielding himself up to the authority of the law, by reason whereof the administration of the law was by the respondent brought into reproach and discredit in the Commonwealth. As a result of such negotiations, it was collusively arranged and agreed that the surrender of Barney should be made to the respondent personally in Northampton at a time to be determined by Barney.

3. That while Barney was with the respondent in an automobile in Northampton, in company with O'Halloran, the respondent did not apprehend Barney nor cause him to be apprehended nor call any police officer of the city of Northampton or other person to assist in his arrest, but, on the contrary, permitted Barney to depart from his sight and presence, and from the sight and presence of O'Halloran, and made no effort to apprehend him or cause him to be apprehended or give information as to his whereabouts to any police officer of said Northampton or other official, thereby giving Barney an opportunity to make his escape if he so desired, all being in furtherance of the conspiracy above set forth.

4. After the return of Barney, in a statement written by the respondent on June 30, 1920, which he, the respondent, caused to

be published in the daily press on July 1, 1920, and which purported to explain how he apprehended Barney, who had, in fact, come with him from Northampton to Middlesex County, the respondent made false statements in connection with the apprehension of Barney, knowing the same to be false and intending thereby to conceal the true facts from the public and to deceive the public and the duly constituted officers of the Commonwealth as to the manner in which and the means by which Barney was induced to return, and as to where Barney was previous to and at the time of his voluntary return. This statement, annexed to the information as "A", was as follows:

" Tuesday morning I received a communication from Barney to the effect that he desired to talk with Inspector Edward O'Halloran of Newton and me with reference to his returning to State Prison, whence he escaped some weeks ago. Arrangements for meeting him were made and Wednesday morning Inspector O'Halloran and I met him just outside of Brattleboro in the State of Vermont.

" He expressed a desire to return with us to State Prison, giving as his reason therefor the fact that he was now very much recovered in health, which at the time of his escape was badly depleted. Accordingly arrangements were made to return to Massachusetts with him. I notified Elmer Shattuck, warden of the State Prison, that he was in Cambridge with me, and in due course he was delivered to the warden at the State Prison.

" I never met Barney personally until yesterday morning, although I have seen him in court in Cambridge. There can be no question as to his having violated the law, but if I ever saw a young man who was truly repentant and who wished to make amends for the past by good conduct in the future, Barney is such a man. His reputation has been bad, but I believe it has been intentionally blackened by a lot of people who designedly made him out to be worse than he is. He has been blamed for many things which he never did. That I know, for there was at least one complaint against him in Middlesex County which later could not be substantiated by proof.

### No Thought of Handcuffing Him.

" The situation in which he finds himself is an unfortunate one and should be a warning to young men to be careful in their choice

of companions. Whatever Barney's faults may have been, he has always been credited with telling the truth so far as his word is concerned. In other words, his word has been as good as his bond. Accordingly when he signified his desire to return with Inspector O'Halloran and me, there was no thought of doing anything else to insure his continued presence with us. He may have been armed, but I cannot say surely, for I did not search him.

" He left us while he changed his clothes and ate his dinner. He then came out, got into the machine and rode with us to Boston. Neither Mr. O'Halloran nor I had very much talk with him.

" He expressed deep regret at the death of Mr. Deininger and told us that he hoped some time to make some amends to the latter's family other than through confinement in prison. He expressed to us also that he had not seen Manster nor heard of him since the night of his escape. He also volunteered the information that his departure from the prison walls took place 15 minutes after Manster and Ward had left the institution.

" He made just one request of us, namely that he be allowed to stop and see his father and mother, who live in Arlington, before he was taken back to State Prison. That request was granted gladly. There can be no doubt of the genuineness of the affection which he has for his father and mother."

5. On July 15, 1920, the commissioner of the department of correction of Massachusetts, in pursuance of his official duty, having read the statement, wrote to the respondent requesting further information, and specifying the same in the following questions: 1. Please state the time when you first heard directly from Barney. 2. From what telephone exchange was the message sent? 3. At what telephone exchange was it received? 4. What was the substance of Barney's remarks over the telephone? 5. At what time did you start out to bring back Barney, and who accompanied you? 6. In what town and on what street did you first see Barney? 7. What was his appearance and how was he dressed? 8. Will you please send me a copy for our files of any statement which Barney made to you as to where he had been while at liberty?

That the department of correction by its commissioner and other officials, pursuant to the requirements of law and in the performance of its duties in the premises, was and had been

investigating the manner of the escape of Barney and as to his whereabouts for the purpose of apprehending Barney and also one Manster, a convict who had escaped with Barney and who had not been apprehended. It was the duty of the respondent, in aid of the department and in response to the inquiry of the commissioner, to have answered the letter, and to have given the information requested, because the respondent in his public statement had said that he met Barney outside of Brattleboro in the State of Vermont and on Tuesday, June 29, had talked with Barney over the telephone. The respondent did not reply nor make a report to the department of correction as requested, but allowed the false and misleading statements which he had made to remain uncorrected and thereby permitted the officials and the public to continue to believe that his false statement, published July 1, was true, by reason whereof the respondent did wilfully and intentionally conceal from the department information that the escaped convict had been in hiding within the Commonwealth with the knowledge of the respondent and had been without arrest or apprehension in the company of the respondent within the Commonwealth.

6. The respondent knowingly and deliberately violated the provisions of the laws of this Commonwealth in that he did, on June 28, 1920, and again on June 29, 1920, cause a false registration to be made in a hotel register at Greenfield of Edward P. O'Halloran, a person then and there with him, whose name he falsely registered as " Thomas Fleming of Natick," in violation of St. 1918, c. 259.

7. The respondent on or about May 1, 1917, unlawfully conspired with William J. Corcoran, formerly District Attorney for the Northern District, Daniel H. Coakley, a member of the bar, and divers other persons to the informant unknown to communicate to divers other persons the threat that an indictment or indictments would be procured and presented to a Grand Jury for the County of Middlesex, charging such other persons with the commission of crimes and offences against the laws of the Commonwealth unless they, so to be accused, should make payments of large sums of money to the persons with whom the respondent so had conspired, whereby the respondent in such conspiracy did conspire with such divers persons to extort a large sum of money

under the threat and menace of the institution and prosecution of criminal accusations and proceedings, and the respondent, pursuant to the conspiracy, did permit and promote the making of threats of criminal prosecution against such persons, and they, in fear of the criminal accusations and proceedings so to be instituted pursuant to the conspiracy, did under the threat and menace pay out large and divers sums of money to the persons who had so conspired with the respondent and had in conspiracy with the respondent permitted such conspiracy, whereby the respondent wilfully and unlawfully abused the authority of his office and permitted it to be made the instrument of fraud and extortion of the moneys and properties of such persons.

8. On or about May 12, 1917, the respondent conspired with the persons named in the preceding paragraph to defraud certain men upon a fictitious charge which he threatened to indict them upon, in order to aid the conspirators in obtaining a large amount of money from such men.

9. By threats of prosecution of such men, the respondent aided and abetted the conspirators above named to obtain from the men whom he threatened to indict a large sum of money, to wit, $100,000.

10. The respondent entered into agreements with the conspirators above named in order to carry out the scheme of conspiracy by promising that, if they paid money to certain persons, he would not prosecute, thereby compounding a felony.

11. In pursuance of the conspiracy, the respondent agreed not to prosecute such men if they paid money to certain persons, well knowing the charge which he made against them would be an inducement for them to pay a large sum of money in order to avoid the publicity of an indictment.

12. In pursuance of the conspiracy, the respondent did not prosecute upon appeal one Stella C. Kennedy, alias Lillian A. Kingston, otherwise known as Brownie Kennedy, who had been found guilty of keeping a house of ill fame in Woburn, at which house the persons who paid the money were alleged to have been, although he well knew all the facts which clearly proved her guilt.

13. In further pursuance of the conspiracy, with sufficient evidence in his possession, the respondent subsequently failed to prosecute Kennedy upon another charge of similar character, to

wit, the keeping of a house of ill fame at Cambridge on or about November 4, 1918.

14. In divers other cases (described in the final decision of the court), with sufficient evidence in his possession, the respondent from improper motives failed to prosecute persons who had committed crime within his jurisdiction.

15. The respondent had refused to issue capiases for Helen A. Morse, alias Lillian Dale, charged with keeping a house of ill fame on or about November 4, 1918, in Cambridge, who was defaulted in criminal proceedings, although he was requested so to do and was informed as to the whereabouts of the defendant, who was at the time of such refusal within the jurisdiction of the Commonwealth.

16. The respondent made a false affidavit to the court with reference to the case of the Commonwealth against Helen A. Morse, alias Lillian Dale, knowing the statements contained in the affidavit to be false, or recklessly and without belief in the truth thereof, whereby the court was misled and deceived.

17. The case of Commonwealth *v.* Morse, alias Dale, was placed on file by the respondent without the knowledge of the officer prosecuting the complaint and without making inquiry as to the facts of the case from the officer or any of his assistants or others having knowledge thereof.

18. The respondent caused secret indictments to be returned by the Grand Jury of Middlesex County against John Marshall Barry and George T. Perry, severally, charging conspiracy on or about July 11, 1918; against William Whitehead, charging him with receiving stolen property on or about May 10, 1919, and against Austin DeGuiglielmo, charging him with a criminal assault on or about March 1, 1919. The respondent had failed to cause to be issued capiases for the apprehensions, arrest, and arraignment of the defendants therein, although they were within the jurisdiction of the Commonwealth and could and should have been apprehended and arraigned.

19. The respondent failed to cause the defendants above described, against whom secret indictments were found by the Grand Jury, to be apprehended and arraigned, or to make any effort to cause their apprehension, although they were within the jurisdiction of the Commonwealth. In 1915 one William De-

Foe Bigelow, or William DeForrest Bigelow, was indicted, William J. Corcoran being then District Attorney, and since that time the indictment had been kept secret and hidden and the defendant had not been called into court to plead to the same or recognize, all with the knowledge of the respondent.

20. The respondent, in violation of duty, neglected in nineteen specified instances to prosecute suits on recognizances to secure the attendance of the defendants in court when they had become defaulted, and to collect from sureties the amount of their bonds, although the sureties were amply able to pay the amount due to the Commonwealth thereon.

21. In violation of his oath of office, the respondent, from improper motives, nolprossed and filed certain cases, described in the final decision of the court, which he should have prosecuted.

22. In violation of his oath of office, the respondent, from improper motives, failed and refused to prosecute certain indictments and appealed cases, described in the final decision of the court.

23. The respondent, from improper motives, refrained from bringing to the attention of the court, in certain cases, described in the final decision of the court, which were before the court for sentence, the fact that such cases under the law were punishable by imprisonment or by both fine and imprisonment, and by reason of such conduct, the defendants were sentenced by the court to the payment of fines instead of to imprisonment or fine and imprisonment, as the law required.

24. The respondent wilfully neglected to prosecute in behalf of the Commonwealth a suit against John R. Fairbairn as sheriff of the county of Middlesex for a large amount of money claimed to be due the county for the defalcation of an officer for whom, as sheriff, he was alleged to be responsible, and unreasonably neglected and delayed to bring the case to trial, and unreasonably and wilfully continued the case from time to time, with the apparent intent of eventually causing it to be dismissed by the court in which it is pending, and thereby causing the Commonwealth to lose a large amount of money.

25. With witnesses at hand or available so that he could with reasonable effort have obtained the information required for the proper prosecution of certain cases, described in the final decision of the court, the respondent wilfully closed his eyes to his duty

and withheld evidence and neglected to introduce proper evidence, thereby failing properly to perform the duties of his office in the prosecution of said cases.

26. The respondent entered into a conspiracy with certain persons to secure the commission of crime by one Stearns, in order to enable the wife of Stearns to obtain a divorce on the ground of adultery.

27. The respondent failed to prosecute Stearns for the crime committed by him, although he knew that Stearns had committed the crime, and although he knew that the crime was committed within his own county.

28. The respondent also failed to prosecute one Chambers, who was accused of adultery, Chambers being his client or the client of his partner or associate, when he knew and had the evidence to prove that Chambers had committed adultery in the county of Middlesex.

29. The District Attorney has maintained an office in Boston in the county of Suffolk, where he carried on his profession as a lawyer in association with George Stanley Harvey, who was, during all the period covered by the specifications herein contained, an Assistant District Attorney of the Northern District, and thereafter, under the firm name of " Tufts, Harvey and Campbell," the individual names of the firm being Nathan A. Tufts, George Stanley Harvey, and Frank W. Campbell, personally and by the members of his firm has defended criminal cases in this Commonwealth, and has acted for persons charged with crimes against the Commonwealth, whereby he has received emoluments that came from such services.

30. In order to avoid pressure brought upon him to bring to trial certain persons then under indictment (as described in the final decision of the court), the respondent paid certain sums of money to the persons insisting that the defendants be tried.

31. The respondent, from improper and unlawful motives, delayed the prosecution of an indictment brought against certain defendants (Turner, Hart, Barry, Perry and Collamore, described in paragraph 18, *supra,* and in the final decision), although the complainant upon whose complaint the indictment was found urged and solicited the respondent to bring the case to trial, and where the respondent had or could obtain evidence which would sustain

said defendants' conviction, and he out of unlawful and improper motives shielded and protected the defendants from being prosecuted.

32. The respondent, in September, 1917, procured or caused to be procured an indictment against one Thomas Mozette for the larceny of $11,000 from Justine Gordon of Cambridge; two indictments against said Mozette for larcenies of small amounts were also pending in Suffolk County. The said Mozette had fled from this Commonwealth immediately after the commission of the alleged crimes, and was finally, through the activity of the Boston Police Department and the assistance of Captain Hurley of Cambridge, located, apprehended, and arrested at Akron, Ohio, on February 23, 1920. Information of the arrest was brought to the attention of the District Attorney for the County of Middlesex, who thereupon, well knowing the importance of said arrest and of having said Mozette returned to the Commonwealth under the rendition proceedings then pending, forthwith nolprossed or caused to be nolprossed the said indictment, a false statement of the reason for so disposing of the case being filed with the papers, by which action he enabled the said Mozette to secure bail in a small amount, upon procuring which said Mozette immediately fled, and is still a fugitive from justice.

The information closed with a prayer "that the said Nathan A. Tufts be removed from his office as a District Attorney."

Paragraphs 15-18 of the informant's specifications were as follows:

" 15. In May and June, 1920, the respondent did unlawfully conspire with Harry E. Levenson, an attorney at law, and with William J. Corcoran, an attorney at law, formerly District Attorney for the Northern District, and with Herbert Gordon, a captain of the police department of the City of Cambridge in said County of Middlesex, to extort from James S. Athans, George H. Grant, Charles P. Korsak, and the International Service Co., Inc., a large sum of money by threats of criminal prosecution, and the said District Attorney, pursuant to said conspiracy, did permit and promote the making of threats of criminal prosecution, and did himself threaten criminal prosecution against the said Athans, Grant, Korsak, and the International Service Co., Inc., and the said Athans, Grant, and Korsak, in fear of said criminal accusations and proceedings so to be instituted pursuant to said con-

spiracy, did, under the threat and menace, pay the sum of $7,500 to the said Harry E. Levenson.

" 16. In addition to the specific cases heretofore set forth in this information, an examination of all criminal cases appealed from the inferior courts to the Superior Court of the County of Middlesex during the years 1919 and 1920 discloses that in thirteen hundred eighty-eight cases (not including non-support, desertion and abandonment of wife and children, and bastardy cases) sentences of imprisonment aggregating one hundred twelve years, two months, four days, and, in addition, one hundred thirty-eight indeterminate sentences, and fines aggregating $28,810, were imposed in the said inferior courts; and that of the said thirteen hundred eighty-eight cases nine hundred two cases were disposed of in the Superior Court by the entry of *nolle prosequi* or were filed or placed on probation by or on the recommendation of the said District Attorney; that in the remaining four hundred eighty-six cases so appealed to the Superior Court the aggregate of the sentences of imprisonment was twenty-seven years, seven months, four days, with twenty-nine indeterminate sentences, and fines aggregating $12,822.50; that of the said nine hundred two cases which were disposed of by the entry of *nolle prosequi* or by placing on file or probation by or on the recommendation of the said District Attorney, sentences of imprisonment imposed in the inferior courts aggregated sixty-one years, three months, twenty-three days, and, in addition, eighty-seven indeterminate sentences, and the fines imposed aggregated $14,753.50.

" 17. That during the said years 1919 and 1920, two hundred fifty-eight persons were convicted in the inferior courts of the county of Middlesex of crimes and offences pertaining to the use and operation of motor vehicles, for which offences sentences were imposed in the said inferior courts of imprisonment in fifty-two cases and fines in the remaining two hundred eight cases, and, upon appeal to the Superior Court, a sentence of imprisonment was imposed in one case, fines were imposed in sixty-five cases, and the balance of one hundred ninety-two cases were disposed of by the entry of *nolle prosequi* or were filed or placed on probation by or on the recommendation of the respondent; and of the said one hundred ninety-two cases a large proportion were cases in which the defendants had been convicted of operating motor

vehicles while under the influence of intoxicating liquor, or reck-
lessly, or so as to endanger the lives and safety of the public, or
of going away without making themselves known after causing
injury to persons upon the highway.

"18. That during the years 1919 and 1920, twenty-eight per-
sons who were convicted in the inferior courts of the county of
Middlesex of using automobiles without the authority of their
owners appealed from the judgment of the inferior courts to the
Superior Court of the county; that in the inferior courts sentences
of imprisonment were imposed in twenty-six cases and fines were
imposed in the remaining two cases; and that in the Superior
Court, upon appeal, sentences of imprisonment were imposed in
eight cases, fines were imposed in four cases, and the remaining
sixteen cases were disposed of by the entry of *nolle prosequi* or
were filed or placed on probation by or on the recommendation
of the respondent."

The respondent filed a motion that the proceeding be dismissed,
assigning as reason therefor that the court and the justices thereof
had no jurisdiction to grant the prayer of the Attorney General;
and also a motion that the scope of the hearing in the proceeding
"be limited, first, to acts and omissions alleged to have been com-
mitted or omitted by the respondent since his last election to the
office of District Attorney for the Northern District, to wit,
November 4, 1919, and, second, to acts and omissions alleged to
have been committed or omitted by the said Nathan A. Tufts
in or concerning the office of District Attorney for the Northern
District and affecting the proper administration of the said office
of District Attorney for the Northern District."

The two motions were heard on June 10, 1921, by *Rugg,* C. J.,
*Crosby, Pierce, Carroll,* & *Jenney,* JJ.

*M. M. Johnson* (*F. Goldman* & *D. Greer* with him), for the
respondent.

*J. W. Allen,* Attorney General, & *H. F. Hurlburt,* Special As-
sistant Attorney General, (*E. H. Abbot, Jr.,* Assistant Attorney
General with them,) for the informant.

The following decision upon these motions was rendered on
June 21, 1921.

RUGG, C. J.   This is an information, bill or petition by the
Attorney General brought under G. L. c. 211, § 4, for the removal

of Nathan A. Tufts from his office as District Attorney for the Northern District. It was heard first upon two motions filed by the respondent, one being a motion to dismiss in the nature of a plea to the jurisdiction, and the other a motion to establish limitations upon the hearing.

1. The pertinent words of G. L. c. 211, § 4, are, "A majority of the justices [of the Supreme Judicial Court] . . . if sufficient cause is shown therefor and it appears that the public good so requires, may, upon a bill, petition or other process, upon a summary hearing or otherwise remove . . . a county commissioner, sheriff, register of probate and insolvency or district attorney." It is assumed for the purposes of this decision that, where the Constitution in terms provides for removal from office by impeachment and does not confer upon the Legislature power to provide for removal in other ways, the specification of impeachment in the Constitution by implication prohibits action by the General Court for removal from office by other means. Cooley's Constitutional Limitations. *Lowe* v. *Commonwealth*, 3 Met. (Ky.) 237. *Speer* v. *Wood*, 128 Ark. 183, 187. *State* v. *Martin*, 87 Kans. 817, 819. *Dinan* v. *Swig*, 223 Mass. 516, 517. See 2 Impeachment and Trial of Archbald, 1661.

It is provided in the Constitution by c. 1, § 3, art. 6, " The house of representatives shall be the grand inquest of this commonwealth: and all impeachments made by them shall be heard and tried by the senate;" and by c. 1, § 2, art. 8, " The senate shall be a court with full authority to hear and determine all impeachments made by the house of representatives, against any officer or officers of the commonwealth, for misconduct and maladministration in their offices. . . ." The point to be decided is whether district attorneys come within the description " officer or officers of the commonwealth " in art. 8.

With reference to that article it was said in *Opinion of the Justices*, 167 Mass. 599, 600, rendered to the House of Representatives concerning the liability to impeachment of a county commissioner: " There are several classes of civil officers within the Commonwealth; for example, town or city officers, county officers, officers of districts, and State officers. In a certain sense, all of these officers may be deemed to be officers of the Commonwealth, and it is possible accordingly to take the view that all are

subject to impeachment. But in our opinion this provision of the
Constitution was not intended to include all civil officers of every
grade within the Commonwealth. On the one hand, it seems to
us that the various officers of cities or towns do not fall within
the class of officers of the Commonwealth, in the sense in which
these words are used in this provision of the Constitution. On
the other hand, officers elected by the people at large, or provided
for in the Constitution for the administration of matters of general
or State concern, are subject to impeachment. The intention of
the framers of the Constitution in respect to such officers as county
commissioners is not free from doubt. The office of county com-
missioner is created by statute, and the Legislature can by statute
determine in what manner an incumbent may be removed from
office. They have some duties or functions which concern the
people of the State at large. . . . It seems to us that the better
construction of the constitutional provision is that the county
commissioners are not subject to impeachment as officers of the
Commonwealth."

In a certain sense a district attorney is a public officer in which
the general public has a deep and vital interest. *Commonwealth
v. Kozlowsky,* 238 Mass. 379. Many other officers, also, are in
a sense public. *Bolster* v. *Lawrence,* 225 Mass. 387, 389. The
district attorney is not an officer "elected by the people at large"
but by the voters of the several districts for which they are chosen.
G. L. c. 12, § 12. District attorneys have been referred to in
judicial opinions as "local prosecuting officers," and their power
as confined "within their respective districts." *Parker* v. *May,*
5 Cush. 336, 339, 340. Their duties are by G. L. c. 12, §§ 27, 28,
in general to be performed "within their respective districts,"
although they may interchange official duties.

The district attorney is not an officer created or "provided for
in the Constitution." The only places where that office is men-
tioned are in arts. 8 and 19 of the Amendments. In art. 8 it is
provided that no "county attorney," among other officers, shall
continue to hold office after accepting an election to Congress;
and in art. 19, that "The legislature shall prescribe, by general
law, . . . that district-attorneys shall be chosen by the people
of the several districts, for such term of office as the legislature
shall prescribe." These provisions merely recognize an existing

office. They do not secure its tenure nor confer any right in the office superior to the control of the Legislature. The Constitution ordains how the officer shall be elected and a single act of one so elected which shall vacate the office. It does nothing more. " It is within the constitutional authority of the Legislature, by general law, to change the term of office, or to abolish the office itself, and transfer the powers and duties thereof to another." *Opinion of the Justices,* 117 Mass. 603. See *Commonwealth* v. *Boston & Maine Railroad,* 3 Cush. 25, 50. It was said by Chief Justice Knowlton in *Graham* v. *Roberts,* 200 Mass. 152, 157, quoting the words of Chief Justice Shaw in *Taft* v. *Adams,* 3 Gray, 126, 130: " Where an office is created by law, and one not contemplated, nor its tenure declared by the Constitution, but created by law solely for the public benefit, it may be regulated, limited, enlarged or terminated by law, as public exigency or policy may require." It was provided by art. 19 of the Amendments to the Constitution that commissioners of insolvency should be elected by the people of the several counties, as well as district attorneys by the people of the several districts, for terms to be prescribed by the General Court. It was held in *Dearborn* v. *Ames,* 8 Gray, 1, that a statute transferring substantially all the powers formerly exercised by commissioners of insolvency to courts of insolvency thereby established was constitutional. Even where the Constitution creates an office but makes no provision for its term or the method of removal of its incumbent, the General Court may act in these particulars in the public interests. It may establish any rational means of removal from such office for any just cause. *Opinion of the Justices,* 216 Mass. 605, 606.

At the next session of the General Court after the ratification of the Nineteenth Amendment to the Constitution and pursuant to its mandate, St. 1856, c. 173, was enacted, which by §§ 1 and 5 provided for the election of district attorneys and the other officers therein designated, and by § 7 for the removal of the same officers including district attorneys by the procedure now set forth in G. L. c. 211, § 4.

There have been reported two cases under the statute of which G. L. c. 211, § 4, is the present form. In 1858, after the adoption of the Nineteenth Amendment to the Constitution, in *Bullock* v. *Aldrich,* 11 Gray, 206, it was said concerning a petition presented

for the removal of a district attorney, that it was not in a condition to be received because not properly verified and supported by affidavits, but " If so verified and supported, it may be filed and an order of notice issued." In *Commonwealth* v. *Cooley,* 1 Allen, 358, the statute was invoked for the removal of a district attorney on the ground of insanity. After due proceedings had and upon consideration it was ordered that defendant " be and hereby is removed" from the office of district attorney and "forejudged and excluded from holding or exercising the same office." Thus there has been a clear exercise of jurisdiction under the statute. It is the duty of this court of its own motion always to consider its jurisdiction over any matter. Consent or waiver by parties cannot confer jurisdiction over any cause or proceeding not vested by law in the tribunal. *Eaton* v. *Eaton,* 233 Mass. 351, 364, and cases collected. In the Cooley case that duty of inquiry as to jurisdiction was peculiarly exigent, because of the incapacity of the defendant to act for himself.

These reasons lead to the conclusion that the statute under which the present proceeding is brought is not unconstitutional and that the court has jurisdiction to decide it.

The vesting of this duty in the courts is not violative of art. 30 of the Declaration of Rights. The duties of the district attorneys have such intimate connection with the administration of justice and the work of the courts in their jurisdiction over crimes as to render inquiry into their moral fitness upon grounds proper for judicial procedure an appropriate function of courts. The case upon this ground is within the principle established by *Driscoll* v. *Mayor of Somerville,* 213 Mass. 493, and *Swan* v. *Justices of Superior Court,* 222 Mass. 542.

The motion to dismiss for want of jurisdiction is denied.

The motion to restrict the hearing has two parts. It is set out in the information that the respondent first was elected as District Attorney for the Northern district on November 7, 1916, and qualified as such officer on January 3, 1917, and has since then continuously held such office, having been again elected on November 4, 1919, and again qualified on January 7, 1920. The first part of this motion in effect is that the scope of the hearing be confined to acts alleged to have been committed since his last election on November 4, 1919. Without at this moment making a final and

complete statement of the law, it is enough to say that acts of such nature may be proved to have been committed by the respondent during his first term of office as to constitute " sufficient cause" for, and to make it appear "that the public good" requires, his removal from office. The single circumstance of a re-election is not enough to prevent inquiry into acts alleged during the first term. Some of the charges referred to in the information relate to matters involving moral obliquity and positive crime of great magnitude committed in connection with the office of district attorney. If proven, they might be found to constitute sufficient cause why the person guilty of them ought no longer to hold that office. The respondent was his own successor by the second election. In substance and effect it is a continuous service.

Upon this point there appears to be some divergence of view amongst the several courts. We do not pause now to examine the cases in detail or to determine how far the seeming conflict may be reconciled by comparison of different constitutional and statutory provisions. A considerable, if not the greatly preponderant, weight of authority supports the conclusion here reached. *Tibbs* v. *Atlanta*, 125 Ga. 18. *State* v. *Welsh*, 109 Iowa, 19. *State* v. *Bourgeois*, 45 La. Ann. 1350. *Territory* v. *Sanches*, 14 N. M. 493. *State* v. *Hill*, 37 Neb. 80. *State* v. *Magaarden*, 85 Minn. 41, 43. *State* v. *Howse*, 134 Tenn. 67, 78–80. *People* v. *Common Council*, 85 Hun, 601, 610, 611.

The object of our statute is to purge the public service of an unfit officer. Such unfitness may arise from conduct in an office held continuously although during the term of an earlier election.

The second part of this motion relates to acts not performed as district attorney but as a private citizen during the period of the respondent's service as district attorney. Such acts cannot be held as matter of law outside the scope of the present inquiry. Here, also, without formulating a rule, it seems manifest that wrongs which render a man unfit to hold the office of district attorney need not be committed in the immediate performance of, but may arise in conduct wholly outside, his official duties. There may thus be revealed defects in character so heinous as to render one utterly unfit to perform the delicate and important functions of a district attorney. Principles applicable to introduction of evidence need not now be stated nor the rules delimited for a final

decision upon the merits on the two points raised by this motion. It is only determined that the hearing need not as matter of law be so restricted. Full discussion of the governing principles may be deferred until the facts are disclosed. See, in this connection, *Commonwealth* v. *Harriman*, 134 Mass. 314, 324–329; *State* v. *Leach*, 60 Maine, 58.

*Motion to restrict scope of hearing denied.*

On July 2, 1921, the respondent filed an answer, which contained, besides general denials of matters not specifically answered, the following allegations:

Relating to the charges in paragraphs 1–6 of the information, the respondent alleged that about the middle of June one O'Halloran, a police lieutenant of the city of Newton, informed him that he hoped to get information whereby Barney might be induced to give himself up, and further said that he had informed his chief of his intention to secure a vacation and make the attempt to induce Barney to give himself up, and asked the respondent's assistance in such attempt; that on June 28, 1920, the respondent, in consequence of a telephone message from O'Halloran requesting him so to do, went to Greenfield, and there met O'Halloran, who was there going under the name of " Thomas Fleming of Natick;" that early in the morning of June 29 they received a message purporting to come from Barney through an attorney whom the respondent then understood to be Barney's attorney, that he, the attorney, would be willing to talk with them; that they therefore went to Northampton on June 29, but were unable to secure a meeting with Barney; that they were not informed of Barney's whereabouts, but that apparently he was where he could be communicated with from Northampton, although, as the respondent was led to believe, he was distant therefrom more than an hour's ride by automobile; that the respondent was then informed that Barney's mother had great influence over him and that, if she would advise Barney personally to give himself up, such advice would have great weight; that the respondent therefore returned to Cambridge and succeeded in inducing Barney's mother to advise her son in the matter; that that night the respondent returned to Greenfield; that on the morning of June 30, 1920, the respondent at last succeeded in meeting Barney, who appeared upon a

road which the respondent was informed led to Brattleboro,. Vermont, the respondent then being in an automobile with O'Halloran; that this was the first time that the respondent had communicated with Barney personally or had seen him or had known where he was; that up to this time there was no understanding or agreement whatever between the respondent and Barney; that at this meeting Barney first asked for a delay of two or three weeks. in giving himself up, because he said his health had been impaired while in prison but was now improving; that the respondent refused to assent to any delay; that Barney finally offered to give himself up as soon as he could change his clothes, shave, and procure some food, demanding only assurance from the respondent that the respondent would not disclose where he had met Barney; that the respondent acceded to this offer, having formed the judgment that he could trust Barney in this respect and the respondent gave such assurance to Barney; that after a delay of about two hours Barney returned, shaven and dressed in better clothes, to the place where the respondent first met him and voluntarily gave himself up, asking that on the way to the State prison he would be allowed to see his mother once more; that the respondent then conveyed Barney by automobile to Arlington, where his mother lived, and allowed him to see his mother; that from there the respondent took Barney by automobile and delivered him up to the proper authorities at the State prison.

The respondent admitted that he prepared a statement which was given to the press on June 30, 1920, substantially as set forth. in the information; that it was substantially correct except in one particular, namely, that the respondent did not meet Barney "just outside of Brattleboro in the State of Vermont;" that he made that statement merely to keep his assurance to Barney that he would not disclose where the respondent met him. As to the first line of the statement, wherein the respondent referred to a communication with Barney, the respondent answered that he did not receive this communication personally from Barney, it being from the attorney whom the respondent then supposed represented Barney, but whom he later learned represented Barney's father and mother. The respondent further averred "that he did not know then and does not now, except by hearsay, where or by whom Barney had been concealed or harbored," and that,

when requested so to do by the Attorney General, he gave to the Attorney General the true facts in detail and in writing.

The respondent admitted that he personally registered O'Halloran on June 28, 1920, and again on June 29, 1920, as "Thomas Fleming of Natick." He denied that he intentionally and deliberately violated the provisions of the laws of this Commonwealth; but stated "that he made such registration because O'Halloran was already known as 'Thomas Fleming of Natick' in and about Greenfield, and because he understood and believed that the 'True-Name Law,' so called, was passed for the purpose of preventing immorality, and that in its spirit and purpose it did not apply to false registration made under the circumstances in which he registered the name of O'Halloran as Fleming." He averred that "he made such registration because he thought it unwise that the true name of O'Halloran should be disclosed, lest doing so might interfere with the success of their endeavor to secure the surrender of Barney. If there were any infringement of law, it was at most only technical, and made for what the respondent believed to be a proper purpose."

The respondent denied the charges contained in paragraphs 7–13, both inclusive, of the information, expressly denying that he conspired with any person to communicate to other persons threats that an indictment would be procured or that he in any way assisted in causing large and divers sums of money to be paid to any person; or that by threats of prosecution he aided other persons to obtain from the men threatened large sums of money or any sum of money; or that he entered into any agreement with such accused men, promising them, if they paid money to certain persons, that he would not prosecute.

The respondent denied the allegations of paragraphs 26 and 27, and stated that, although twice consulted early in the matter by Mrs. Stearns, he did not take her case and had nothing further to do with it. On information and belief he stated that a divorce was granted to Mrs. Stearns on the ground of cruel and abusive treatment. He further stated that no notification was ever given to him by the judge who heard the case that adultery had been committed, nor was any evidence sent to him by the judge or by any one else; that no complaint ever was made to him as District Attorney of any crime committed by Stearns, nor was any com-

plaint ever made, to the respondent's knowledge, to any lower court of any such crime; that long after the divorce had been granted, the respondent heard rumors and gossip concerning the matter, but never had been called upon to take action in the matter, nor had he "even now learned facts which would warrant the prosecution of Stearns for the crime of adultery."

As to the charges in paragraph 29 of the information, the respondent admitted that he, as a partner with Messrs. Harvey and Campbell, had maintained a law office since January 1, 1920, in Boston. He stated that on one occasion one Boyd, a friend and neighbor of his, was accused of an illegal act in connection with the driving of an automobile in Boston; that Boyd requested Mr. Campbell to take care of the case, but that on the morning of its coming up in the Municipal Court of the City of Boston, the respondent was called upon at the last moment, owing to the illness of Mr. Campbell, to take upon himself the defence of the suit; that the respondent did so, believing that the accused was mistakenly charged with the offence alleged, and that the accused was found not guilty and was discharged; that that was the only criminal case in which the respondent had taken part for a defendant.

The respondent generally denied the allegations contained in paragraph 30, and stated that the only occurrences which would give rise to such a charge were where certain moneys, paid in restitution, were turned over to the complainants by the respondent, having been paid to the respondent by the attorney for the accused person; that that occurred only once or twice and that thereafter any money brought in in restitution was paid over through the probation officer.

The respondent denied generally the allegations of paragraphs 31 and 32 of the information and paragraph 15 of the specifications, and further stated that the matters therein alluded to were in charge of his assistants, that the disposition of these matters was made after investigation by such assistants and on their reports, and that the respondent believed such disposition to have been proper.

As to the allegations contained in paragraphs 16–18, the respondent stated that he could not admit nor deny the figures therein and demanded proof thereof, if the same were material.

He averred that there were, on an average, eighty trial days in each calendar year since he had occupied the office, and that not over one case on the average could be tried in a day; that there had been about three thousand new cases brought to his office each year, and that he had to do the best he could with the twenty-nine hundred that could not be tried; that, early in his incumbency and more than once thereafter, he had requested the Chief Justice of the Superior Court for additional means of trying cases, and, from time to time, had been given some relief by a few extra sessions, although not so much time of the court in his district as he repeatedly urged; that he later introduced a bill in the Legislature providing for greater means for the trial of cases in his district, and was informed and believed that such bill had now become a law to go into effect the fall of 1921; that in the trial of cases he and his assistants had worked faithfully and steadily, and that the presiding judges had frequently expressed satisfaction with his work and the work of his assistants and his office; that in the disposition of the many cases which could not be tried, he and his assistants had used their best efforts in making fair, reasonable, and just disposition in the light of the information which they had in regard to each matter; that the number of cases in which an entry of *nolle prosequi* had been made by the respondent had been small compared with the number in which such an entry had been made by his predecessors and with the common practice of district attorneys in the Commonwealth, as he was informed and believed; that he never had placed a case on file or a defendant on probation during his service as district attorney, nor had he imposed any sentence, all of those things having been done by the judges of the Superior Court; that in all cases he had given the court the best information which he and his assistants had on hand, as also had the probation officers who acted independently of his office.

As to the charges contained in paragraphs 7–13, both inclusive, paragraphs 14–23, both inclusive, and paragraph 32 of the information and paragraph 15 of the specifications, the respondent stated that, in many instances he might furnish the court with more details, except for the reason that such details came to him as information received in his official capacity as District Attorney, and that he was informed and believed that such communications were absolutely privileged and should not be disclosed to any per-

son or upon any occasion (referring to *Vogel* v. *Gruaz*, 110 U. S. 311, and *Worthington* v. *Scribner*, 109 Mass. 487); that he felt that it was his duty to rely and insist upon, and did rely and insist upon, "any right, privilege, and immunity arising out of the crea- tion and establishment by the Constitution of the National Gov- ernment or arising out of or under the Fourteenth Amendment to the Constitution of the United States."

With particular reference to the charge that the respondent had not prosecuted cases of alleged automobile theft with due diligence, the respondent averred that from January 1 to October 1, 1920, there were approximately seventy-eight such cases within his district; that, during the same period, for instance, there were ap- proximately ten hundred fifty-four cases of alleged breaking and entering; that similar conditions existed during the rest of his serv- ice as District Attorney. He admitted that he had not selected one particular class of cases, such as automobile cases, for prosecu- tion, but averred that he had "done his best with the means and opportunity afforded him to cause all of the criminal laws of the Commonwealth to be respected, to cause violators of all laws to fear punishment for such violation, and to vindicate the criminal laws of the Commonwealth according to their tenor and spirit."

The case was heard upon the merits during twenty-four court days from July 11 to and including August 11, 1921, by *Rugg*, C. J., *Braley*, *Crosby*, *Carroll*, & *Jenney*, JJ.

*J. W. Allen*, Attorney General, *H. F. Hurlburt & W. Flaherty*, Special Assistant Attorneys General, (*A. Hurwitz & C. R. Cabot*, Assistant Attorneys General with them,) for the informant.

*M. M. Johnson & F. Ranney* (*F. Goldman & D. Greer* with them), for the respondent.

At the close of the arguments, the court stated: "The court ap- preciate the courtesy and good nature which have characterized the conduct of counsel under highly uncomfortable conditions through- out this trial, and they acknowledge the assistance rendered by the thorough and candid arguments which have concluded the hearings."

On October 1, 1921, the following decision was rendered.

RUGG, C. J.   This information brought by the Attorney Gen- eral for the removal of the respondent from the office of district at- torney for the northern district is now ripe for final decision

upon its merits both of law and of fact.  A majority of the justices have sat for twenty-four days to hear evidence and arguments. The statute under which the proceeding is brought already has been held to be constitutional.  Its material words are quoted again: " A majority of the justices [of the Supreme Judicial Court] . . . if sufficient cause is shown therefor and it appears that the public good so requires, may, upon a bill, petition or other process, upon a summary hearing or otherwise remove a . . . district attorney."  G. L. c. 211, § 4.  A precise and detailed description of the acts which constitute ground for removal is not attempted in the statute.  Words of general import and broad scope are used. " Sufficient cause " must be shown and the " public good " must require before there can be removal.  These are terms of wide signification.  It is not necessary for the court in the case at bar to undertake to limit by definition that which the Legislature has seen fit to state only in ample outline.  A few principles are sufficient for the determination of the present issues.

The powers of a district attorney under our laws are very extensive.  They affect to a high degree the liberty of the individual, the good order of society, and the safety of the community.  His natural influence with the grand jury, and the confidence commonly reposed in his recommendations by judges, afford to the unscrupulous, the weak or the wicked incumbent of the office vast opportunity to oppress the innocent and to shield the guilty, to trouble his enemies and to protect his friends, and to make the interest of the public subservient to his personal desires, his individual ambitions and his private advantage.  The authority vested in him by law to refuse on his own judgment alone to prosecute a complaint or indictment enables him to end any criminal proceeding without appeal and without the approval of another official.  Powers so great impose responsibilities correspondingly grave.  They demand character incorruptible, reputation unsullied, a high standard of professional ethics, and sound judgment of no mean order.  Profound learning and unusual intellectual acumen, although eminently desirable, are less essential.  A district attorney cannot treat that office as his selfish affair.  It is a public trust.  The office is not private property, but is to be held and administered wholly in the interests of the people at large and with an eye single to their welfare.

The removal of a district attorney is a drastic act. It strips the individual of the enjoyment of a position of distinction to which he has been regularly selected. It deprives the people of the services of one whom they have chosen. The power of removal is vested by the statute in the judicial department of government. That circumstance implies from its very nature that the cause for removal must be one cognizable by courts in the exercise of judicial attributes. Every political, social, personal, racial and other consideration is excluded from the field of thought. The sole matter for inquiry is the public welfare, as affected by the moral, intellectual and professional characteristics and conduct of the man in question. Such characteristics and conduct need not be confined to his administration of the office, nor to the period of his official service. An isolated act of malfeasance outside the present term of office or having no relation to official duties, not showing a corrupt or depraved disposition, doubtless would be insufficient to warrant removal. Misdeeds or lapses for which expiation has been made by established uprightness and integrity would hardly justify removal. If his character is bad, his sense of moral fitness blunted, or in other respects his behavior is offensive to the right minded, so that public confidence in the purity and impartiality of his official work is justly shaken, then sufficient ground for removal is shown.

Several rulings were made in the course of the trial which have a bearing upon main issues.

Request was made to save exceptions to rulings of the court In a proceeding like the present exceptions cannot be entertained. The full court is sitting to hear and decide a matter within its exclusive jurisdiction. Its rulings are not open to review or revision. It may reserve a point for its own future consideration. Its decision upon any matter is final.

Objection was made to the introduction of evidence concerning communications made to the respondent in his official capacity on the ground that they are absolutely privileged and cannot lawfully be disclosed to any person or upon any occasion. The rule as to the privilege of such communications, when it is sought by private parties for their own interests to make inquiry into them, has no relevancy to a proceeding like the present. It is a principle of law founded upon sound public policy and arising out of

the creation and establishment of constitutional government that communications made to a district attorney in order to secure the enforcement of law are privileged and confidential in the sense that they cannot be revealed at the instance of private parties in aid of actions at law. It was said by Mr. Justice Gray in *Worthington* v. *Scribner*, 109 Mass. 487, at pages 488, 489: "It is the duty of every citizen to communicate to his government any information which he has of the commission of an offence against its laws. To encourage him in performing this duty without fear of consequences, the law holds such information to be among the secrets of state, and leaves the question how far and under what circumstances the names of the informers and the channel of communication shall be suffered to be known, to the absolute discretion of the government, to be exercised according to its views of what the interests of the public require. Courts of justice therefore will not compel nor allow the discovery of such information, either by the subordinate officer to whom it is given, by the informer himself, or by any other person, without the permission of the government. The evidence is excluded, not for the protection of the witness or of the party in the particular case, but upon general grounds of public policy, because of the confidential nature of such communications." The same principle was declared in *Vogel* v. *Gruaz*, 110 U. S. 311, 316, and *In re Quarles & Butler*, 158 U. S. 532, 535, 536. That principle at this trial was invoked to exclude, amongst other communications, conversations between the respondent and those who, fearing that they might be accused of crime, went to show themselves to him and if possible avert the apprehended prosecution. Such a situation is wholly outside the scope of the principle. That principle has no application to any situation which arose in the trial of the case at bar. This is a proceeding instituted by the Attorney General. See *Attorney General* v. *Methuen*, 236 Mass. 564. It is brought against the respondent pursuant to the extraordinary terms of a special statute. That statute authorizes an inquest into the respondent's official rectitude and general qualifications to hold an office of great power and responsibility, to the end, that, if he be found unfit, the public service may be purified by his removal. By strong implication it forbids that the respondent be permitted to seek the shelter of a privilege established for the protection of the good order of society, in order

to screen himself from just inquiry into his official conduct. The Commonwealth speaking through the statute has waived whatever privilege it might have in order that there may be full investigation into the propriety from the standpoint of the general welfare of permitting one of its officers to continue to conduct its business.

The informant sought to introduce evidence of recommendations for the filing of cases or the nolprossing of cases by assistants to the district attorney, which if done by the respondent himself might have been admissible under some one of the charges of the information. There are four assistants to the District Attorney for the Northern District authorized by law. This evidence was excluded because there was no allegation in the information that the respondent appointed incompetent or corrupt assistants or knowingly retained such assistants in office, or that the respondent organized his office in such way as to be inefficient or corrupt in its management and disposition of cases. In view of the charges in the information, mere facts of recommendations for filing of cases or the nolprossing of cases by an assistant to the district attorney, unless accompanied by evidence to the effect that it was either in general or in particular authorized by the respondent, was not competent. The question whether an assistant district attorney has authority to enter a *nolle prosequi,* or whether such extraordinary power to annul the action of the grand jury and of police, district and municipal courts and trial justices can be exercised only by the district attorney himself, was left open for later argument and decision if necessary. It was not again raised and need not be decided.

The respondent offered to prove (1) that the bringing of this information was inspired by political and personal motives and not by regard for the public weal, (2) that by opinion evidence conditions relating to the protection of life and property in the northern district had been better during the administration of the office by the respondent than they were before, and (3) that by opinion evidence the respondent was a faithful and efficient officer. These offers of proof were severally excluded.

The motives which led to the institution and prosecution of this proceeding have nothing to do with the guilt or innocence of the respondent on the charges made. Political rivalry or personal animosity cannot make the respondent unfit to hold office. He can be harmed only by his own conduct and character.

The opinion of any witnesses, however experienced, that life and property are better protected in the northern district since the respondent has held office than before, has no relevancy upon the question whether he has committed the breaches of duty set forth in the information. Many other considerations enter into a comparison such as is suggested in the offer. The predecessor of the respondent may have been worse than he. The police of the several cities and towns, over which the respondent has no control, may have become more efficient. Waves of crime may have subsided. The subject is one which is not susceptible of expert evidence. The range of facts is so wide and such a variety of diverse considerations enter into the problem that it is outside the domain of legal evidence in a proceeding like the present.

Evidence from observers that the respondent has appeared to be faithful and efficient has no bearing upon the truth of the charges here made. The allegations of the information are confined to definite matters. That the respondent has prosecuted other cases with due regard to the public interest has no tendency to show that he was not derelict as to those here in issue. The decision in *State* v. *Marrero*, 132 La. 109, does not seem to us to support the position of the respondent as to the admissibility of evidence of this nature. We are clear that the evidence ought not to be received.

Several paragraphs of the information charge the respondent with being a party to conspiracies. The familiar and classic description given by Chief Justice Shaw in *Commonwealth* v. *Hunt*, 4 Met. 111, at page 123, is that " a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Commonwealth* v. *Harris*, 232 Mass. 588, 591. The combination for the illegal purpose or for the use of illegal means is the essence of conspiracy. It is not necessary that all the conspirators join in every part of the unlawful transaction. The motives by which the several conspirators are actuated may be most diverse. The part each is to play, the reward or satisfaction to be received by each, and the knowledge possessed by each of the scope and details of the affair may be widely at variance. For example, a conspiracy to commit arson might be engaged in by A solely

from desire to observe a conflagration, by B from malignant hatred for the owner of the house, by C in the hope of obtaining excessive insurance on personal property of his own within the building, and by D for the pittance paid him by the others to arrange inflammables and apply the match, each being utterly ignorant of the motives of any of his associates. Such a combination would plainly be a conspiracy on the part of the four even though two of them could by no possibility receive any financial profit. It is elementary that a conspiracy may exist even though the purposes of the participants or of some of them may not be discoverable by the means open in the trial of causes. " A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." *Commonwealth* v. *Smith*, 163 Mass. 411, 417, 418. *Commonwealth* v. *Rogers*, 181 Mass. 184. *Commonwealth* v. *Clancy*, 187 Mass. 191, 195. *Commonwealth* v. *Riches*, 219 Mass. 440, 442. It is not essential to a conspiracy that the parties meet or that they confer and formulate their plans. Common purpose may be inferred from concerted action converging to a definite end.

We proceed now to the consideration of the several charges set forth in the information and its accompanying specifications.

1. The charges set forth in paragraphs 1 to 5 both inclusive of the information relate to the Barney case, so called. We find the material facts concerning the allegations in the first four paragraphs to be these: On or about May 30, 1920, one Barney, then undergoing sentence for the crime of manslaughter committed in Suffolk County, escaped from the State prison in Suffolk County. He remained in or in the vicinity of Cambridge for about a week and saw three or four times by appointment in some secret place at night one Bresnihan, a member of the bar. Before leaving Cambridge Barney gave to Bresnihan the name of the man and his address in Northampton in this Commonwealth to whose house the escaped felon went after leaving Cambridge and remained until returned to the State prison. Bresnihan conferred with a police officer of Newton, suggesting the possible apprehension of Barney,

and the police officer notified the respondent that he had a clue for Barney and asked the assistance of the respondent if he should need it.  On Saturday, June 26, 1920, Bresnihan and the Newton police officer went to Northampton.  The former immediately entered into communication with Barney for his surrender, which continued at intervals from Saturday until the following Wednesday.  During that period the respondent, first in response to a telephone message from the Newton police officer, visited Northampton three times and negotiated for the surrender of Barney with Bresnihan and Barney's mother and his stepfather.  On Wednesday morning Barney was taken into the automobile owned or hired by the respondent and after conversation there lasting about fifteen minutes, the Newton police officer being present, he was permitted to depart with Bresnihan, neither the respondent nor the police officer then knowing where he was or had been staying further than that it was somewhere in Northampton.  They allowed Barney thus to depart merely upon the assurance that he would return given by Bresnihan, who was acting for Barney, for his mother, or for his stepfather, or for all of them.  Barney was gone considerably over an hour, during a part of which even Bresnihan did not know where he was.  He then surrendered.

It was a breach of duty in the respondent, having come to the aid of the Newton police officer and undertaken the direction of their movements and being of the two the person of far higher official position and greater responsibility, to permit the escaped convict, after having voluntarily come into his automobile for a considerable period on Wednesday morning, again to depart in freedom with every opportunity to escape.  There was no obligation of fancied honor and no previous agreement for thus permitting Barney to continue at large.  It was a purely voluntary act sanctioned by the respondent after the escaped convict of his own free will had placed himself in a position to be apprehended.  The purposes desired to be accomplished by Barney during his absence might have been accomplished even though he had been retained in custody.  The fact that the surrender was subsequently made after an uncomfortably long absence and that thus no harm resulted ultimately does not efface the great risk taken by the respondent in thus allowing to an escaped convict between one and two hours of additional freedom.  We do not discuss whether

other laws and duties of a citizen in this connection were violated,

The respondent testified that he agreed with those representing Barney as conditions upon which the surrender was made (1) that he would not divulge where he got Barney, (2) that Barney would not be physically injured in connection with his return to the State prison, (3) that Barney might visit his father and mother before he went back into the State prison, and that he made no other agreements touching the matter. The respondent testified in substance that he made no promise to say that Barney was apprehended in Brattleboro or in Vermont and brought into Massachusetts. The respondent, the Newton police officer and Barney travelled in the same automobile from Northampton to the neighborhood of Cambridge. Late in the evening of the same day Barney was delivered up at the court house in Cambridge. The respondent was there, a crowd of people and a number of newspaper men. The respondent then gave out for publication in the newspapers of the following morning, July 1, 1920, the statement annexed to the information as "A." That statement was dictated by the respondent and given to the press by him in the form in which it was printed. It was in every respect the deliberate and premeditated act of the respondent. He was not acting under pressure or emergency. He was not surprised into speech by any unexpected exigency. There had been ample opportunity for calm reflection. That statement was misleading in some respects and false in others. Its first sentence was this: " Tuesday morning I received a communication from Barney to the effect that he desired to talk with Inspector Edward O'Halloran of Newton and me with reference to his returning to State Prison, whence he escaped some weeks ago." The first communication received by the respondent (after the statement by the Newton police officer that he had a clue for Barney) was by telephone from O'Halloran at Greenfield about eighteen miles from Northampton either on Sunday evening, June 27, or early Monday morning, June 28. This was a request to come to Greenfield in some form of words not clear in meaning but naturally to be interpreted by him in view of his knowledge as indicating a possibility that Barney might be apprehended. Early on Tuesday morning there was a telephone to O'Halloran at Greenfield from Bresnihan at Northampton in substance requesting him and the respondent to come to the latter city. There

the respondent talked with Bresnihan and the stepfather of Barney but not with Barney. The substance of that conversation was that Barney would not surrender at that time. His mother came from Cambridge during that day and saw him and on the following morning he surrendered. The first sentence of the statement therefore was misleading. The second important assertion of fact was this: "Wednesday morning Inspector O'Halloran and I met him just outside of Brattleboro in the State of Vermont." That statement was unqualifiedly false. The respondent knew that it was without a vestige of truth because he participated in the surrender at Northampton that very day and had been in that city on the two previous days negotiating to that end. He had not been in Brattleboro in reference to the matter, nor nearer to that place than Greenfield in this Commonwealth. The falsehood of this statement was admitted by the respondent upon the witness stand. It is both confessed and proved. Whether a promise by a district attorney to an escaped convict to tell a falsehood to the public in order to secure his surrender is justifiable, or whether, if made, it ought to be kept, are questions which have no connection whatever with this case. On his own testimony the respondent made no such promise. His only promise according to his evidence was not to tell the place where the surrender occurred. The keeping of that promise by the respondent did not require and had no relation to telling a deliberate untruth to the public, of course deeply interested in the apprehension and return to the State prison of such a criminal. It afforded no semblance of a pretext for the intentional misrepresentation to the public of a material fact in connection with the affair. The fourth sentence of the statement, namely, "Accordingly arrangements were made to return to Massachusetts with him," was likewise utterly without foundation in truth and was so known to the respondent. In the statement given out for publication occurs the assertion, "Neither Mr. O'Halloran nor I had very much talk with him" on the way from Northampton to Waltham or Boston. The respondent testified at this trial that "We had a lot of talk" and he gave the substance of considerable conversation. Another sentence is that Barney "made just one request of us, namely, that he be allowed to stop and see his father and mother, who live in Arlington, before he was taken back to State Prison." The plain implication, if not

the express phrase of this statement, is that this was the only request or condition attached to the surrender. That is misleading in view of the express promises not to reveal the place of surrender and to preserve him from bodily injury. The conduct of the respondent in personally participating in the effort to apprehend Barney, whatever may have been the motive actuating him, manifested bad judgment in one holding the office of district attorney in a district where neither the original crime for which he was serving sentence nor the subsequent crime of escape from the State prison was committed. The Commonwealth and many of its cities maintain at large expense detectives for work of that sort. The duties imposed by law upon a district attorney are of a wholly different nature. Upright men may not always exercise common sense. Mistakes of judgment do not affect character. Premeditated deception accompanied by the deliberate telling of lies is a radically different matter. Such conduct goes to the roots of honesty. The person who is guilty of acts like these is untrustworthy. The falsehoods voluntarily, intentionally, intelligently and deliberately told by the respondent concerning the apprehension of Barney reveal a lamentable want of appreciation of moral values. They disclose either entire ignorance or wanton disregard on his part of the fundamental obligation of a public officer to tell the truth when he speaks. This obligation is most stringent upon a district attorney, in whom is reposed the high trust of enforcing the criminal laws and exercising the vast power of his office as to the disposition of criminal cases.

2. The allegations in paragraph 5, summarized, are that the commissioner of the department of correction wrote to the respondent a series of questions concerning Barney directed to the ascertainment of facts as to his apprehension and in detail the time, place, and instrumentalities of the respondent's connection therewith. The facts respecting this allegation as shown at the trial are that on July 9, 1920, the commissioner of the department of correction wrote to the respondent asking for a complete report of all facts relating to the apprehension and return of Barney for the files of his office, and intimating that the information might be of assistance in apprehending another felon who made his escape on the same night as did Barney. A brief note, containing no material facts of the kind requested, was sent under date of July

15, 1920, in reply to this letter. On July 21, 1920, the commissioner sent to the respondent another letter requesting answers to twelve questions which were directed to the ascertainment of facts as to the surrender of Barney and the hiding place of the other escaped felon. ' This letter was courteous in form and pertinent in substance. It was not answered. The reasons given by the respondent upon the witness stand for his refusal to answer that letter were (1) that he was under no obligation to answer it, and (2) that the commissioner had theretofore made unjust criticism of him, and thus had offended him. The first of these alleged reasons is flimsy, the second is unworthy of a district attorney. We find no ground for inference or even for suspicion that the commissioner intended to make an improper use of the information for which he inquired, or that he had any sinister purpose in writing his letters. It may be assumed that no direct mandate of statute required the respondent to answer the questions. Yet the commissioner of the department of correction was a servant of the Commonwealth charged with highly important duties concerning the State prison. The apprehension and return to confinement of prisoners escaping thence while serving sentence was of vital interest to him in his official capacity. R. L. c. 222, §§ 3, 4. St. 1913, c. 829. St. 1916, c. 241, §§ 1, 2, 7, 8. St. 1919, c. 350, Part III, §§ 82, 83, 84. It is almost inconceivable that a district attorney genuinely devoted to the public welfare should refuse for such pretended reasons to give the commissioner the facts for which he asked. The real reason for the respondent's refusal was that frank and true answers to the questions would have disclosed arrant falsehoods in the statement given by him to the press for publication on July 1, 1920. The force of this incident is not broken by the circumstance that under date of October 21, 1920, in response to a demand from the Attorney General, the respondent wrote to him a letter giving much of the required information. In that letter to the Attorney General was a detailed statement of the facts as to the apprehension and return of Barney substantially as shown at the trial before us, except that in it the respondent said that Barney "asked us to say that it [the place of surrender] was near Brattleboro, this in order to relieve the people he had been with from any embarrassment." There was at the trial no evidence that such request was made

or promise given. The respondent requested that that letter be treated as confidential and only gave his consent that such use might be made of it as the Attorney General might think proper when the latter declined to receive the information on the footing of being confidential.

3. We find the facts with respect to paragraph 6 of the information to be that on June 28, 1920, the respondent on the hotel register at the Weldon, a hotel in Greenfield in this Commonwealth, wrote with his own hand as the name of the police officer, whom he well knew to be Edward P. O'Halloran, a resident of Newton, the name "Thomas Fleming," and his residence, "Natick." Two days earlier O'Halloran had at another hotel in Greenfield given as his name P. J. Fleming and his residence as 19 School Street, Chicopee, Mass. This act of registration was the voluntary act of the respondent. It was provided by St. 1918, c. 259, § 6 (see now G. L. c. 140, § 29), that "No person shall write, or cause to be written, . . . in any register in any . . . hotel any other or different name or designation than the true name or name in ordinary use of the person registering or causing himself to be registered therein. Nor shall any person occupying such room or rooms fail to register or fail to cause himself to be registered." The penalty prescribed for violation of this provision is a fine of not less than $10 nor more than $25. The General Court in its wisdom has enacted this law. It has made no exceptions in favor of district attorneys or other persons. *Commonwealth* v. *Karvonen,* 219 Mass. 30. The respondent testified that he knew of the existence of the law, that he had no intention of violating it, that he thought O'Halloran suggested the name and place of residence to be registered, and that he should regard it as unwise for a person so well known as O'Halloran to use his true name on such an errand. It is too well settled to require a moment's discussion that these factors constitute no excuse in law for the violation of a mandatory penal statute by the respondent under the circumstances shown. *Commonwealth* v. *Mixer,* 207 Mass. 141. *Duane* v. *Merchants Legal Stamp Co.* 231 Mass. 113, and cases collected at page 123. Although the offence thus committed was punishable by a very small fine, the fact remains that the respondent committed that crime. It is not for the district attorney or any other public officer or private individual to violate

at will a law which the Legislature has enacted. If it seems trivial, too wide in its sweep, or for any reason unwise, the remedy is for the Legislature to repeal or amend and not for individuals to break the law. A district attorney ought not to set an example of disobedience to a penal statute. Orderly and stable government depends upon strong public sentiment in favor of legality. In a republic such as ours, where government is " of the people, by the people, for the people," liberty itself is founded upon obedience to law. Flouting of laws by the powerful affords to the wicked a specious pretext for breaking them.

Our finding on this charge for violation of St. 1918, c. 259, § 6, standing alone, would not be regarded as sufficient ground for removal of the respondent under G. L. c. 211, § 4. The final order does not rest on this finding of violation of St. 1918, c. 259, § 6.

4. The charges in paragraphs 7 to 13 both inclusive of the information and in paragraph 1 of the specifications are, summarily stated, that the respondent and William J. Corcoran, formerly District Attorney for the Northern District, and Daniel H. Coakley, a member of the bar, and others to the informant unknown, formed a conspiracy to extort money by threat of indictment, consummated by the extortion of $100,000 from the persons against whom the conspiracy was contrived. We find upon all the evidence that the material facts are these: In the early morning of March 7, 1917, at the conclusion of a banquet held on the evening of the previous day at a Boston hotel, about fifteen men, among whom were four residents of New York engaged in the moving picture business and reputed to be possessed of great wealth, went to the Mishawum Manor, a house of ill fame in Woburn in the northern district. Arrangements had been made in advance for their coming. Prostitutes were there to meet them. An orgy of drink and lust took place. Some of the men did not leave until daylight. On May 9, 1917, one Lillian A. Kingston, who was also known as Kennedy, the keeper of the place, was tried in the local court in Woburn upon two complaints, one charging her with keeping a liquor nuisance and the other with keeping a house of ill fame during a period which in each instance included the sixth and seventh of the preceding March. She was found guilty on both complaints and sentenced to pay a fine of $100 on the first

named complaint and to serve a term of imprisonment for six months on the latter complaint. She appealed on both complaints. She was defended at those trials by William J. Corcoran. The chief witnesses against her were Theresa Sears, a piano player, and Bessie McDonald, a waitress, each serving in her respective capacity at the Mishawum Manor on March 6 and 7, 1917. A stenographer, employed by Mr. Corcoran, alone made full and accurate notes of the testimony at that trial. Mr. Corcoran took and has retained possession of the note book in which these notes were made until recently in the current year, when for the first time they were written out for use in the present trial. An account of that trial at Woburn was printed in Boston newspapers, one at least giving the names of one or more of the New York men of wealth in the moving picture business present at the orgy at the Mishawum Manor on the early morning of March 7. A newspaper clipping of that account subsequently was sent to the wife of one of the four moving picture men. On May 9 or May 10, the chief of police of Woburn, since deceased and therefore not testifying before us, told the respondent of the character of the place known as Mishawum Manor and asked and was promised assistance in causing the community to be rid of it. On May 9, 1917, a letter was written to the respondent by Mr. Aylward, a former city solicitor of Cambridge, of the tenor following: " I desire to call your attention to the fact that I have evidence gathered over a period of some two months about the character of the place known as the Mishawum Manor. The wife of a client of mine was debauched in that house. I intend to bring proceedings against a New York man, but I feel I should present the criminal phase of the case to you before taking that action. May I hear from you when I may call my client? " Within a brief time one other lawyer notified the respondent that a minor daughter of a client of his had been debauched at the same place. The respondent testified that still another lawyer notified him of a claim similar to that of Mr. Aylward. On May 15, 1917, Mr. Aylward wrote to one of the four moving picture men making a claim on him in behalf of his client. On May 11, one of the four New York men to whom reference has been made, in response to a telephone from the then mayor of Boston to the effect that something important demanded his immediate attention, came to Boston and conferred with Mr.

Coakley. On May 12, Mr. Coakley with two of the four New York men and their New England manager, also one of the March 7 party at the Mishawum Manor, visited the respondent, to whom the three were introduced by Mr. Coakley. The latter stated in substance that he wanted the respondent to see these men and know that they were not rowdies but business men of good standing, and that he could show that they were men of that character who had visited the place to get drink and refreshment and who had been guilty of no further wrongdoing, and that he would like an opportunity to prove this to the respondent, and in the meantime that he hoped that there would be no prosecution of them until he could present the facts to the respondent. The respondent stated that his information was of a different nature, that he had had several complaints, that if Mr. Coakley could get those men to withdraw their complaints he might feel differently, and that the time requested by Mr. Coakley would be granted. Subsequently the respondent sent for the two women who had given evidence in the Woburn court against Lillian A. Kingston. He testified that they would not make to him a statement implicating in crime any visitor at the Mishawum Manor, and that report was later made to him that these women could not be found. He then wrote to Mr. Coakley stating amongst other matters that he believed certain government witnesses in the case had been tampered with. Mr. Coakley wrote his client withdrawing from the case, but within a comparatively short time came into it again. Five other attorneys of this bar were retained to act in behalf of some one or more of the moving picture men. One of them, Mr. Wright, had an interview with the respondent in the course of which the latter referred to these moving picture men as "licentious Jews." To some of these attorneys the respondent said that practices which might pass unnoticed in a large city could not be permitted in a small place like Woburn. About the first of June a summons was issued to Mr. Wright to appear before the grand jury, which the respondent withdrew in a letter of June 4, saying that it had been issued by mistake. One other summons was issued to an employee of one of the four moving picture men who was at the Mishawum Manor at the time in question. He immediately took his summons to Joseph M. Levenson, one of the attorneys for the moving picture men. He never was called to testify. Pursuant

to arrangements made three days earlier, there was paid on June 5, 1917, by or in behalf of the four moving picture men, the sum of $100,000. Fifteen thousand dollars of this went to Joseph M. Levenson for distribution to himself and others except Mr. Coakley who had acted as attorneys for these four men. The remaining $85,000 was paid by Mr. Stoneman, one of their attorneys, to Mr. Coakley, who gave a receipt for that amount reciting and agreeing that it was "in full settlement for all parties interested in all claims arising out of certain incidents which occurred in the premises of one Kingston in Woburn, Mass., on or about March 6, 1917, or any other date. Also in full settlement for my own services and disbursements in connection therewith. I agree to procure releases of all demands from all parties interested running to the clients of the said David Stoneman." This large sum of money was paid by the four moving picture men to suppress and prevent any and all proceedings which would result in further publicity or notoriety touching their presence at the Mishawum Manor and their connection with things there done, and for no other purpose. In performance of his agreement Mr. Coakley secured four releases and sent or handed them to Joseph M. Levenson, or to Mr. Stoneman, who handed them to Mr. Levenson. Two of these were undated, one was dated June 22, 1917, and the other June 25, 1917. One was signed by Theresa M. Sears at the request and in the presence of one Gordon, a captain on the Cambridge police force, assigned exclusively to the duty of assisting the District Attorney for the Northern District, and having an office in the county court house at Cambridge. The fact of these settlements was communicated to the respondent by Mr. Coakley later in 1917. It was understood that nothing further would be done by the respondent against the moving picture men. There was no hearing before the grand jury respecting Mishawum Manor or the events which occurred there on March 7, 1917. The complaints against the Kingston woman came up for disposition in the Superior Court on appeal on June 27, 1917. She then pleaded guilty to the complaint for maintaining a liquor nuisance and was fined $100. The complaint for keeping a house of ill fame was continued until November 18, 1918, when it was placed on file. She was represented by William J. Corcoran. The chief of police of Woburn, having been informed by the respondent that the two women witnesses

Mass.] ATTORNEY GENERAL *v.* TUFTS. 505

in the Woburn court refused to confirm to him the testimony
there given by them, and being assured that the Mishawum Manor
had been and would continue to be abandoned as a place of resort
for illegal acts, and that its keeper had left and would continue
to stay away from Woburn, consented to this disposition of the
cases, as did also the respondent. On January 19, 1918, as a result
of a raid on premises in Cambridge, two complaints were made in
the Cambridge local court against the keeper under the name of
Helen A. Morse, alias Lillian Dale, one for keeping a house of ill
fame, on which the defendant was found guilty and sentenced to
imprisonment for six months, and one for violation of the law con-
cerning intoxicating liquors, on which she was found guilty and
sentenced to pay a fine of $100. Appeal was taken to the Superior
Court on both these cases. The complaint for keeping a house of
ill fame was filed on September 27, 1918, and that for violating
the liquor law, after default of the principal and surety, was filed
on November 4, 1918, the necessary affidavit to that end being
signed and sworn to by the respondent and stating that "every
effort has been made to apprehend her [the defendant] but she
has been reported to have left the jurisdiction of this court." No
action has been brought against the surety in the defaulted case.
Papers of various kinds, including checks upon which was the
name Lillian A. Kingston, were found upon these premises in Cam-
bridge, tending strongly to show that its keeper had been keeper
of Mishawum Manor. The chief of police of Woburn identified
that defendant as Lillian A. Kingston, the keeper of Mishawum
Manor, at the trial of these complaints in the Cambridge court,
although he did not there testify. Information of such identity
was later called to the attention of the respondent, or would have
been conveyed to him if he had sought any conference with the
Cambridge officers in direct charge of the cases against Morse,
alias Dale. We find that the Kingston, alias Kennedy, who kept
the Mishawum Manor, and the Morse, alias Dale, were one and
the same woman. We have no concern in the case at bar with the
financial transactions between the moving picture men and their
attorneys, or any of them, except as they throw light on the
charges against the respondent. The moving picture men were
not without experience and shrewdness in the affairs of the world.
They knew the chances taken by those participating in a debauch

in a bawdy-house. They must have realized full well that publicity could not be suppressed if the district attorney was determined to investigate and get to the root of the affair of March 7 at Mishawum Manor. They must have been advised that the mere settlement of alleged claims by husbands and fathers professing to have been injured would not prevent inquiry by public authorities into a stench in the nostrils of common decency.

The respondent never accepted the offer of Mr. Aylward to "call his client." He made no effort whatever to see that client or either of the other two men whose attorneys notified him of the nature of the violations of law at Mishawum Manor resulting as they claimed in wrongs to these clients. He made no earnest attempt to get from Mr. Corcoran or his stenographer a copy of the evidence given at the trial in the Woburn court. It must have occurred to him as a man of intelligence that these were important and likely to be vital sources of information if he had a sincere purpose to institute any prosecution against the moving picture men or to call the matter to the attention of the grand jury. The resources of that tribunal were ample to compel attendance of witnesses with books and papers. The respondent knew from their silent acquiescence in the statements made in their presence to him by Mr. Coakley as their attorney that at least two of the four chief moving picture men were present at the orgy at Mishawum Manor on March 7, 1917. He failed to make any investigation at all adequate to enable him to form a sound judgment on the question whether the moving picture men were guilty of an offence for which they ought to be indicted. He made no effort to ascertain whether the claims put forward in behalf of the alleged husbands and father of the several women claimed to have been debauched were honest and well founded, or were fabricated, illegal and unenforceable. If the respondent thought a basis existed for prosecution of the moving picture men, he utterly failed to perform his duty with the known material at hand. If he did not think such basis existed, he acted toward some if not all of the counsel for these men as if he thought there was such a basis and intended to institute prosecutions. Whatever his state of mind in this particular, his conduct was blameworthy. He failed to use proper efforts for the conviction and sentence of the woman Kingston, alias Kennedy, alias Morse, alias Dale.

The course of conduct of the respondent throughout this transaction was that which would have been adopted and followed by an astute and cunning district attorney, who was an accomplice in a conspiracy designed to separate this great sum of money from men of wealth timid about further notoriety concerning their participation in a disreputable affair. Whether he was thus guilty need not be determined in the present case.

We find that the respondent was guilty of wilful misconduct in the performance of his duties in the particulars already stated as to the matters set forth in these charges.

5. The allegation in paragraph 14 is that in divers cases, with sufficient evidence in his possession, the respondent has from improper motives failed to prosecute persons who have committed crime in the northern district. There are fourteen specifications under this paragraph. As to four, namely, Florence M. Seale, Maurice B. Hannigan, and two cases, one against Esther J. and the other against John D. Zachorne, no evidence was presented by the informant. The others are taken up in order.

(a) Complaint was made on or about November 30, 1920, against Lillian F. Howe for keeping a house of ill fame in Cambridge. She succeeded the Morse woman with numerous aliases, to whom reference already has been made, in the same tenement. She appears to have been a flagrant offender, numbering among her patrons petty officials who presumably would try to protect her. The case was entered in the Superior Court in January, 1921. The present information was filed on May 25, 1921. There is great congestion of the criminal docket in Middlesex County, which constitutes the northern district. Three murder cases requiring considerable time have been tried within that period in that county. While this case ought to be prosecuted vigorously, the evidence fails to show wrongdoing by the respondent as charged.

(b) Complaint was made against Roland W. Spencer on May 14, 1920, for driving an automobile while under the influence of liquor. The defendant appealed from a fine of $100 imposed after a finding of guilty. The respondent entered a *nolle prosequi* on June 22, 1920. This action was taken without sufficient investigation on the part of the respondent, and such action in our opinion ought not to have been taken. There was a record against the de-

fendant of several convictions, which ought to have been discovered and probably would have been discovered if stringent instructions in general and in particulai had been given by the respondent. Nevertheless, the allegation is not proved as to this case.

(c) The allegation is not supported by testimony as to the case against William J. Downey for attempt to commit larceny.

(d) There are five specifications involving indictments against Charles Weisberg, Joseph Levine and three others, growing out of two incendiary fires in Newton. The evidence shows that Weisberg was hired to set these fires, receiving therefor a small money payment. He had no interest in the property set on fire and nothing to gain from any fires except the wages for his crime. He alone pleaded guilty to an indictment and served a sentence in prison. Some one hired him either for expected profit, for revenge, or for some other reason, to commit the crimes. Levine signed a long statement in writing wherein he implicated the other defendants. Apparently with some reason it was felt that his testimony would not be given weight by a trial jury. Levine refused to plead guilty. The indictments against him were filed and those against the remaining defendants have not been tried. It is an unfortunate result that only the hireling in an arson case should pay any penalty for crimes of the nature here involved. The evidence fails to support the allegation as to these cases.

(e) Complaint was made against Frank Gentile in the Woburn local court for maintaining a liquor nuisance in January, 1921. There was a plea of not guilty, but he was found guilty and sentenced to fine and imprisonment for the term of three months. The case was entered in the Superior Court on the first Monday of February of the current year. The pressure of business in Middlesex County is such that a case of this nature might not be reached for trial even in view of its statutory precedence. Nevertheless, there is nothing to show an improper motive on the part of the respondent in failing to try it before the filing of the information. Another complaint against the same defendant was not entered in the Superior Court on appeal until after the filing of the present information, and is pending without disposition. It is manifest that there is no support for the allegations concerning this case.

Therefore we find the respondent not guilty of the allegations in paragraph 14 and the specifications thereunder.

6. The allegations in paragraph 15 as amplified by the specification, and in paragraphs 16 and 17 of the information, relate to the disposition of the case against Morse, alias Dale, for keeping a house of ill fame in Cambridge. As has already been stated, she and Kingston, alias Kennedy, keeper of the Mishawum Manor, were identical. That fact the respondent either knew or ought to have known. The defendant was defaulted in both cases. Thereafter, the officer in charge of the cases asked the respondent for a capias for the arrest of the defendant, saying that he thought he could find her and bring her in with a capias. The respondent refused to cause a capias to be issued. It seems from the evidence that the woman has now left the Commonwealth and her whereabouts are unknown to the officers. It is not clear that she could have been apprehended if a capias had been requested by the respondent to issue, but it is proved that the officer who asked for it believed that with a capias he would be able to find her. In this there was neglect of duty by the respondent. The affidavit for the filing of the complaint against Morse, alias Dale, for violation of the law concerning intoxicating liquor, was made without conference with the officer or officers in charge of the case, on information obtained from the indictment clerk, so called, connected with the district attorney's office. For a period of about two years no action has been taken to collect on the bonds or recognizances, liability on which accrued to the Commonwealth by reason of the defaults of Morse, alias Dale. There appears to be no adequate excuse for this neglect.

We find that the respondent is guilty as charged in paragraph 15 of the information and its accompanying specification, and that he is not guilty of the charges set forth in paragraphs 16 and 17.

7. It is charged in paragraphs 18 and 19 of the information that the respondent has caused secret indictments to be found and has failed to cause the persons thus indicted to be arrested and arraigned. The facts as to these charges are that indictments were found by the grand jury for serious offences against J. M. Barry, George T. Perry and Austin DeGuiglielmo, that these persons have never been arrested nor have they pleaded nor been asked to plead to these indictments. In the first two cases the

respondent testified that they were represented by an attorney, who promised to bring them in when desired, and that in the third case he had doubt as to the guilt of the defendant, and civil suits growing out of the same transaction as that on which the indictment was framed were pending and not yet brought to trial. This course was irregular and unwarranted. A district attorney has no right to smother an indictment found and returned by the grand jury. Commonly the only sufficient reason for keeping secret for any substantial length of time the fact that an indictment has been returned, is that the person or persons indicted have not been or cannot be arrested or found. Manifestly, when such circumstances exist the indictment should be kept secret. The ordinary duty of a district attorney, when an indictment has been found, is to cause every reasonable effort to be made to have the defendant appear forthwith before the court, either voluntarily, through arrest, or otherwise, and to plead to the indictment, or else to enter a *nolle prosequi* as to the indictment. Secrecy is a fundamental attribute of the proceedings of the grand jury. It is a part of our constitutional liberty and is a safeguard against oppression. *Commonwealth* v. *Harris*, 231 Mass. 584. *Lebowitch, petitioner*, 235 Mass. 357. After the indictment is found and it is feasible to arrest and arraign the person indicted, then the principle of publicity, which is a vital characteristic of the common law, becomes operative. See *Scott* v. *Scott*, [1913] A. C. 417; *Lewis* v. *Lewis*, 220 Mass. 364, 370, 371. It is incompatible with that principle that the district attorney, when arrest is practicable, should cause an indictment to be held as secret as if the indicted person either had not been found or was a fugitive from justice, and should advise only the defendant and those particularly interested in him of the fact that an indictment had been found. Such a course would open the door to great abuses. Publicity then becomes as potent a protection against oppression as is secrecy concerning grand jury proceedings. When one has been indicted, he ought, as soon as is reasonably practicable, to be arrested or in some way brought before the court for arraignment and be required to give adequate security for his appearance. If the district attorney, in the conscientious exercise of his duty, feels that no arrest should be made despite the action of the grand jury in returning an indictment, he ought to take the responsibility of filing a refusal to prosecute,

which is an open act and for which he can be held accountable by the public. If there is no arraignment when arraignment is feasible, and there is no *nolle prosequi* by the district attorney, then the public or the person indicted are or may be without adequate protection or information. These are the general principles. The acts of the respondent shown by the evidence fall within those general principles. It is not necessary to determine whether there may be exceptional instances concerning which these general principles may not be applicable.

There is no evidence that the respondent has caused persons to be indicted who ought not to have been indicted as alleged in paragraph 18 and he is not guilty on that charge. The allegations of paragraph 19 are proved.

8. The allegations set forth in paragraph 20 of the information in substance are failure to prosecute actions on recognizances and to collect the penalties from sureties able to pay. We find that there has been great laxity on the part of some public officers empowered to take bail, so that in many instances in Middlesex County it would have been of no avail to attempt collection by process. It would serve no useful purpose to go through these cases one by one. These allegations are not sustained as to any of the instances in the specifications.

9. It is charged in paragraph 21 of the information in substance that the respondent has from improper motives nolprossed and recommended to the court for filing cases which should have been prosecuted. The cases specified will be considered in order.

(a) The first two specifications relate to indictments against Monroe, Seymour and Lord.

An attorney in Boston, named Clark, at the instance of a lawyer friend in New York, requested one Gordon, a captain on the police force in Cambridge, to accompany a private detective who was endeavoring to secure incriminating evidence of marital infidelity on the part of a woman named Lord as basis for divorce proceedings against her to be instituted in New York. Pursuant to previous arrangement with such detective and in company with him, on or about July 15, 1917, Gordon and one Smith of the State district police as it was then called, both assigned to duty with the District Attorney for the Northern District and having an office in the Cambridge court house, went to an apartment in Cambridge.

They secured admission without delay. No door was locked. They went to a bedroom, where they found Monroe dressed and sitting in a chair, and Mrs. Lord standing, with hair somewhat dishevelled. Her waist was open and she was either dressing or undressing. Captain Gordon announced to them that he was a detective from the office of the district attorney. They gave their names and protested that they were doing no wrong. Some statements were made by the woman, from which, as well as from the situation itself, an adulterous disposition might have been inferred. Either the Lord woman or the keeper of the tenement expressed a desire to telephone to her counsel. She called and conversed with Daniel H. Sugrue, a man long employed by Daniel H. Coakley, an attorney at law, in his office, although not a member of the bar. In a few minutes Sugrue appeared. He told Captain Gordon that he had conversed with the respondent concerning the case. At his solicitation Gordon called the respondent on the telephone, told him briefly the circumstances and stated that Sugrue wanted no arrests made but would agree to have all the parties at the respondent's office the next morning. The respondent gave his consent to that course provided Gordon thought best. No arrests were made. The next morning Monroe consulted Sherman L. Whipple, Esquire, who first telephoned to the respondent that Monroe seemed to him not to have committed any crime, and that a young man from his office named Connor, with Monroe, would confer with the respondent at once. These two, with the two women and Sugrue, were at the office of the respondent on the day following the event under investigation. Mr. Connor, but not Monroe, met the respondent. The conversation was indecisive except that the respondent then or shortly after became incensed at the conduct of Mr. Connor. Several interviews with Mr. Connor and telephone talks with Mr. Whipple followed, the result of which was that the respondent insisted upon the prosecution of Monroe. In September two indictments were found, one against Monroe and Lord for adultery, and one against Monroe and a woman named Seymour for procuring for the practice of prostitution. On September 25, 1917, Monroe retained Mr. Coakley. The indictment for procuring was founded in part at least upon the testimony of a woman named Griffin, to the effect that she overheard a telephonic conversation to that end between Seymour and Monroe

while the former was rooming at her house.  Representations were made by Mr. Coakley to the respondent, subsequently confirmed by investigations by Gordon, that the Griffin woman was or had been the keeper of a house of ill fame.  Mr. Coakley also interviewed Mr. Clark, told him of the situation and suggested to him that no conviction for adultery could be had on the evidence in the possession of the district attorney, and that an acquittal would be more harmful to the divorce proceedings than no trial.  In consequence Mr. Clark wrote to the respondent in substance that, so far as he was entitled to consideration, he preferred that no trial be had of the indictment against Monroe.  Thereupon, after conferences with Mr. Coakley, the respondent agreed to enter a *nolle prosequi* in the indictments against Monroe, and such action was taken on October 31, 1917.  Shortly before that day, $12,000 and something more to, cover disbursements was paid by Monroe to Mr. Coakley in response to a telegram by the latter on October 26, 1917, to Mr. Connor, saying, "Matter satisfactorily arranged if money is available on Monday.  Can close the whole matter as you would like to have it closed on Tuesday."  Beginning with the spring of 1917, Gordon entered into stock speculations with the aid of said Daniel H. Sugrue, which resulted in 1920 in an indebtedness of $6,000 or more from Gordon to Sugrue.

The conduct of the respondent in this matter was reprehensible. He is not found to be responsible for the conduct of Gordon in lending his aid to the procurement of a New York divorce. The police force of any Massachusetts city is supported out of money raised from the people by taxation for the suppression of crime, the maintenance of public order, the protection of life, liberty and property, and the performance of such other duties as may be imposed by the General Court.  It is no part of its duty to aid in the procurement of foreign or domestic divorces.  They should respond to a reasonable call to find evidence of the commission of adultery and, if the presentation of that evidence to a court results in a conviction which forwards the granting of a divorce, they may indirectly give assistance to that proceeding.  That, however, is an incidental result and not the primary aim of police work.

The respondent was in conference about these cases for more than seven weeks between July 15, when the couple were found in

the bedroom, and September 7, when the indictment was returned. All the participants were at large during that period under no legal constraint whatsoever. For their production when wanted nobody was liable. The respondent allowed a captain of police to use his own judgment whether to make arrests on July 15, or to take the word of a layman that they appear, not at court but in his office, on the next morning. The respondent testified that this word was not kept because Monroe (as he said) never to his knowledge came to his office. The proper course was to have caused the participants forthwith to come into the local court. That court had original jurisdiction concurrent with the Superior Court of the crime of adultery, and could have dealt with it finally subject to the defendants' right of appeal. St. 1911, c. 176, § 1, (see now G. L. c. 218, § 26.) That would have afforded immediate judicial inquiry into the question of the guilt of the persons there found. If they had desired continuance for trial and had appealed from an adverse finding and sentence, they would have been put under bonds for their appearance in the Superior Court. So far as appears, neither of the women, Seymour or Lord, ever was arrested or brought into any court. Monroe pleaded to the indictment. It is strange conduct for a district attorney, having so much more work according to his testimony than there was time to do, to have taken upon himself the entire management of such a case, rather than to have had it go, as it ought to have gone in natural course, to the district court of competent jurisdiction sitting in Cambridge, presumably with time enough to give it adequate attention, and where it might possibly have been finally disposed of and never been added to his burdens. There was no opportunity for the respondent to present the matter to the grand jury, and thus have the parties put under bail, for at least six weeks. The district court in Cambridge was in practically continuous session and there would have been no delay. A course of conduct like that pursued by the respondent manifestly is open both to proper suspicion and to grave abuses. One friendly or even acquainted with the district attorney, or having an attorney who sustains those relations, has advantages and opportunities for favors not available to the ordinary person. The administration of the criminal law ought not to be open to the just imputation or the strong suspicion of being conducted on the footing of special favors.

The opportunities and temptations for direct bribery and more subtle corrupt inducement afforded by such a course of conduct are plain. Police, district and municipal courts are provided for the very purpose of deciding the guilt or innocence of persons charged with crimes over which they have jurisdiction, and of determining whether persons charged with crimes of a more serious character ought to be held for the action of the grand jury. It is no part of the duty of the district attorney to usurp that function.

The evidence as to the adultery and the respondent's knowledge of it did not change between the time it was first presented to him by Gordon on July 15 and October 31, when the *nolle prosequi* was entered. It was known as fully to the respondent at the one time as the other. It was sufficient to warrant a conviction. It would have supported a finding of an adulterous disposition and ample opportunity for the gratification of that appetency. *Thayer* v. *Thayer*, 101 Mass. 111. Compare *White* v. *Ely*, 234 Mass. 221. Such a crime ordinarily is not committed in the presence of witnesses. The evidence of the Griffin woman concerning the offence charged in the indictment for procuring for prostitution, so far as appears, did not change. A woman who would permit an inmate of her household in her presence to act as procuress cannot be regarded as of high moral character. The difference between the degree of credibility likely to be accorded by a jury to the testimony of such a person and to that of one who had been the keeper of a house of ill fame, hardly would be a decisive factor in determining whether a prosecution should be abandoned. There is nothing in this record to indicate that the fact that Mrs. Griffin kept a house of ill fame rightly could have been shown at a trial to affect her credibility. The respondent failed in these cases in the performance of his duty by not having the parties arrested and heard in the local court and adequate security given for their appearance when required. If Monroe ought to have been indicted, there is nothing in this record to show that he ought not to have been tried. The respondent became incensed against the attorneys first representing Monroe and then acceded to requests from Mr. Coakley which he had before denied to them. While a district attorney is human, he ought not to visit upon defendants the bad feeling or lack of confidence which he entertains toward their counsel. We are unable to determine to any further extent the

motives which actuated the respondent in dealing with these cases. His conduct was incompatible with a proper administration of his office.

(b) The case of Roland W. Spencer has been discussed and dealt with in paragraph 5 (b) of this judgment. Nothing more need be said concerning it.

(c) The case against Jacob A. Wasserman was for operating an automobile carelessly and recklessly. There is no evidence to support the charge against the respondent in respect to this case.

(d) The case against Morse, alias Dale, has been considered in connection with the Mishawum Manor case under paragraph 4 of this judgment and need not be further discussed.

(e) There was produced no evidence to sustain the allegations of the information in the disposition of the complaints against Dana L. Deshon, Junior, Clement L. Gardner, Daniel J. Sheehan, Lloyd J. Fairbanks, Frank J. Burke, Maurice F. Bronner and Lester B. Hennessy. In several of these cases either the defendants or some of their friends held office of some sort, and these political factors were brought fully to the attention of the respondent, but the evidence does not satisfy us that the respondent violated his oath of office in connection with these cases.

(f) No evidence was offered by the informant concerning the case against William B. Vincent.

(g) The case against Ernest J. Mantha was for maintaining a gaming nuisance in the city of Marlborough. It appears to have been a flagrant case. About thirty persons were found on the premises at the time of the raid and there was evidence that the defendant had conducted a gambling resort there for twenty years. The defendant in the local court was sentenced to fine and imprisonment and appealed. A petition was presented in the Superior Court signed by a large number of persons, some of them prominent and influential, that only a fine be imposed. The raid was made by the representatives of the Watch and Ward Society. The matter was carefully investigated by one assistant district attorney and on his resignation was turned over to another. One judge of the Superior Court, after recommendation by an assistant district attorney that a fine of $100 be imposed, on hearing the agent of the Watch and Ward Society, refused to remit imprisonment and to impose only a fine, and the case was continued with-

out disposition to another time.   It then was presented to another judge in the absence of the agent of the society by the same assistant district attorney, without information of the previous action of the other judge, and a fine was imposed.   This course was highly improper.   The judge who made final disposition of the case was entitled to know the history of the case and what had been the attitude of one of his associates.   Whether this disposition ought to have been recommended by the district attorney presented a question for the exercise of sound judgment.   Whatever may be said concerning the wisdom of the course taken, we cannot say that improper motives actuated the respondent.

(h) The case against James O. Shevlin for being accessory before the fact to abortion was not prosecuted for the reason that he had given the information on which the principal offender was indicted and sentenced.   We cannot say that the extension of immunity on this ground to the defendant was improper conduct on the part of the respondent.

(i) The case against Samuel Finkelstein for forging, uttering and larceny was undoubtedly susceptible of complete proof and might have resulted in a verdict of guilty.   There were extenuating circumstances arising from the relation between the defendant and the payee of the check, who were near relatives, which well might have been thought to render unwise the prosecution of the case. These circumstances need not be narrated at length, but they appear to us to justify the recommendation made by an assistant district attorney that the case be placed on file, which was adopted and followed by the Superior Court judge.

10. It is charged in paragraph 22 of the information that the respondent has from improper motives failed and refused to prosecute indictments and appealed cases.   There are numerous specifications.

(a) On April 1, 1919, an indictment was found against James Hart, a former policeman of Boston, for receiving a stolen automobile.   The evidence seems to have been ample to have warranted a conviction.   Captain Hurley, an inspector on the police force of Cambridge, in co-operation with police officers from Boston investigated the case and gathered and presented the evidence. Captain Hurley several times asked the respondent for a capias for the arrest of the defendant on this indictment, and was refused.

Hart did not become a fugitive from justice and readily might have been found and arrested. Capias issued more than fifteen months later on July 15, 1920, and Hart was arrested and lodged in jail on July 19, 1920. This capias issued after Hart had committed another offence of a similar nature, for which he was indicted in September, 1920. Hart pleaded guilty to both indictments and on December 2, 1920, the first was placed on file and on the second a sentence of two years in the house of correction was imposed. This disposition of the cases was not made until Mr. Hurlburt as Special Assistant Attorney General had assumed some direction in the northern district of the disposition of offences in connection with automobiles. During the campaign for the respondent's re-election as district attorney in the autumn of 1919 he was interrogated in writing by his opponent concerning the Hart case. In reply the respondent gave out for publication in the newspapers statements, repeated in subsequent letters sent to him by his opponent without denial by him, to the effect that the Hart indictment was kept secret and no arrest made for the reason that thereby assistance was received from Hart in the prosecution of automobile thieves. There was no evidence before us that such assistance was given. The reason stated to the public was not the true reason. The respondent also said that, although Captain Hurley had not asked for a capias, even if he had, none would have been placed in his hands because the respondent had lost confidence in him. We are able to find no justification for the failure to arrest Hart within a reasonable time after the first indictment was returned and to have brought him to trial if he did not plead guilty. Even if the respondent had lost confidence in Captain Hurley, that was no reason why the capias should not have been given to another officer and the arrest made.

(b) The charge against the respondent concerning the case against Aldus Turner for receiving stolen goods is not sustained. The evidence shows that Turner is a fugitive from justice and that time and money have been expended in vain efforts to apprehend him and return him to the Commonwealth for trial.

(c) In December, 1917, in Newton an automobile driven at high speed by John W. Coombs collided with the rear of another automobile, causing injuries to several of its five occupants, as a result of which one of them died. Complaints were brought

against Coombs in the Newton court, upon which he was sentenced to both fine and imprisonment. Subsequently an indictment was returned. Several civil actions were brought against Coombs growing out of the collision, some of which are still pending. The criminal case is still pending, untried. On the evidence presented to us the conduct of Coombs appears to have been such as to demand prosecution in the criminal court. The pendency of the civil actions and the pressure of other criminal cases for trial satisfies us that hitherto no improper motives on the part of the respondent are shown in failing to bring Coombs to trial.

(d) The respondent is not guilty on this charge with respect to ten cases against nine women for practising medicine without being registered. The cases arose out of the practice of midwifery by the defendants. The responsibility for the disposition of these cases was taken by and rested wholly upon the judge.

(e) The complaint against John L. McTiernan for operating an automobile recklessly so as to endanger the lives and safety of the public was entered in the Superior Court in January, 1921. Serious injury resulted to the driver of a horse drawn vehicle from the conduct of the defendant. The case is pending. Every circumstance indicates that the case has not yet been tried because of the congestion of the criminal docket in Middlesex County.

(f) There was against Charles Merrimen in the Newton court one complaint for operating an automobile under the influence of liquor, on which he was sentenced to pay a fine of $100, and another for operating an automobile so as to endanger the lives and safety of the public, on which he was sentenced to two months in the house of correction. There was a plea of guilty on September 29, 1920, and nothing has been done in the case since. The evidence does not disclose whether there were circumstances which warranted such delay in calling the defendant for sentence. We find the respondent not guilty on this charge.

(g) James Hughes and Ernest Linegar were before the court charged with receiving stolen property. The cases are still pending without final disposition. The delay has been in order that reparation or restitution may be made to those from whom the property was stolen. We find the respondent not guilty of the charge in respect of these cases.

11. The charge in paragraph 23 of the information is that the

respondent from improper motives has refrained from calling to the attention of the court circumstances which required punishment either by imprisonment or by both fine and imprisonment, with the result that the plain intent of the law has been prevented.

(a) In the case against Richard Neal for the illegal keeping of intoxicating liquors the respondent was lax. He failed to avail himself of information at hand and easily available to the effect that the crime charged was a second offence and that therefore under the law a sentence including imprisonment should have been imposed, and the respondent ought to have presented that fact to the judge. The sentence of both fine and imprisonment imposed in the district court, even if there were nothing else, was sufficient to put the respondent on inquiry. But on the evidence we find the respondent not guilty of the charge of improper motive as to this case.

(b) The circumstances of the indictment against Alfred W. Lavigne were fully made known to and understood by the court. Suggestion as to the propriety of nolprossing a part of the indictment in view of the advanced age and feeble health of the defendant emanated from the presiding judge. We find the respondent not guilty on the charge concerning this case.

12. The charge in paragraph 24 of the information is that the respondent has unreasonably neglected and wilfully refused to prosecute in behalf of the Commonwealth an action on the bond of the sheriff of Middlesex County to recover a large sum due to the defalcation of an officer of that county. The writ was dated April 18, 1914. The case therefore has been pending more than seven years. The respondent is responsible only for the delay since he assumed office on January 3, 1917. Successive Attorneys General have written to the respondent urging him to bring it to trial. It has been referred to an auditor, but no hearings have been had. The attorney for the defendant was in Washington engaged in war work for some time and died on December 28, 1918. His partner has now been retained by the defendant and has sought continuances, which have been granted by the court. The last order of the court was that the time for filing the auditor's report be extended to and including January 1, 1922. Manifestly it is a case which ought not to be allowed to slumber longer. It is plain from the respondent's testimony that he has not been zealous in the

prosecution of the case. The orders of the court in the matter go far toward exonerating him from corrupt motive. We find him not guilty on this charge.

13. It is charged in paragraph 25 of the information that, with witnesses at hand or available, the respondent withheld evidence and thus failed in his public duty. There are several specifications.

(a) Byron A. Wilcox was bound over to await the action of the grand jury on a complaint for receiving stolen goods. Before the grand jury considered the case, a young clerk who had done political service for the respondent called upon him twice, once with Wilcox. During the conference some reference was made to this political aid. There is nothing to show that the case was not fairly presented to the grand jury or that its action in returning no bill was the result of desire of the respondent to reward political service.

(b) The case of Maurice Basher for operating an automobile under the influence of liquor appears to have been presented to the judge in the presence of the prosecuting police officer, who manifested no opposition to the proposed disposition. Moreover, the final presentation of this case to the court was in the hands of an assistant of the respondent.

(c) One Louis Bennett, confined in the Cambridge house of correction, made charges in the early part of 1921 to the effect in substance that two brothers named Corcoran, one employed in the House of Correction and the other in the Middlesex County Court House, had proposed to him to pay $1,000 to one or the other of them to the end that he might be released on parole before Thanksgiving of 1920, and that that sum had been so paid, and after an interval returned. Captain Gordon, a member of the Cambridge police force assigned for service to the office of the district attorney, and the respondent were also implicated in the charges although not in the receipt of money. The matter was investigated by the Attorney General to the knowledge of the respondent. It was also investigated by the respondent, who caused the statements made to him to be taken stenographically and to be written out. He then presented the matter to the grand jury. Whether the charges would be thought to be true by the grand jury or by any impartial tribunal would depend upon the extent to which they were corrob-

orated by the witnesses other than Bennett. The material witnesses, whose statements tended to support the fact of the alleged payment of $1,000 to Charles Corcoran, were Bennett, the convict, his wife, who had said that she was at the Cambridge court house on or about Tuesday, November 16, 1920, with one bill of the denomination of $1,000, one Butler, her brother, who had said that he handed that bill to Charles Corcoran in the court house, and one Marston, the chief engineer in the House of Correction, who had said that he, being in the court house on the day in question to draw his own pay, saw Mrs. Bennett there with Charles Corcoran, that on the evening of that day Bennett told him that his wife had that day paid to Charles Corcoran $1,000 in the court house, and that he had made an entry in his diary of this statement made to him by Bennett. The respondent had talked with all these witnesses and had their statements made to him transcribed. Bennett, the convict, was the only one of these material witnesses called by the respondent to testify before the grand jury. Butler, the brother of Mrs. Bennett, at the request of the respondent, on the Saturday before the grand jury hearing had narrated to him with particularity the circumstances under which he paid the money substantially as he testified at the trial at the bar of this court. The respondent did not summon him to appear before the grand jury. That was the simple and direct course to pursue. There is nothing to show that he would have been discharged from his employment if he had been summoned. Discharge for any such reason of course would have been utterly unjustified. The respondent made no effort to arrange with his employer for his attendance before the grand jury. He did not even tell Butler that he wanted him to testify before the grand jury, but merely asked him to come to his office again on a day named. The respondent accepted the statement of Butler, that, being an expert auditor and accountant working as he was sent at various places, he was working in Providence, and that his time was not his own. It seems inconceivable that genuine effort by the respondent would not have procured the attendance of this essential witness before the grand jury. He was present a few weeks later at a hearing concerning the same matter before the county commissioners. Mrs. Bennett was sick, according to the testimony of the respondent, and could not be present at the grand jury hearing.

The respondent offered to read her testimony to the grand jury. Marston, the chief engineer of the House of Correction, was not called as a witness although in attendance and ready to testify, but the respondent summarized fairly the substance of what he would have said had he been called. Gordon and the respondent both testified before the grand jury and then the Corcoran brothers testified. All of these witnesses flatly contradicted the testimony given by Bennett, the convict. The respondent made no request of the Attorney General to offer to the grand jury whatever evidence he had gathered, or to advise him of the results of his investigation although he knew that it was made or was in process of being made earlier than the grand jury hearing.

At the conclusion of all this testimony the respondent said to the grand jury in substance: " This completes all the witnesses we have with the exception of two, one who has sent word that it is impossible to appear because of illness, and the other who says if he comes he will lose his job. He works in Providence. I have their statements and will read them if you wish." The statements were not read. We draw the inference, having clearly in mind the rules as to the secrecy of proceedings before and of the actions of the grand jury and its members, that this was because the grand jury did not want to hear them. See *Commonwealth* v. *Hill*, 11 Cush. 137, 140; *Commonwealth* v. *Mead*, 12 Gray, 167, 170; *Commonwealth* v. *Harris*, 231 Mass. 584, 586; *Commonwealth* v. *Homer*, 235 Mass. 526, 533.

It is obvious that this matter was not fairly presented to the grand jury. The respondent conducted the hearing before the grand jury. He testified himself before the grand jury. This course showed conspicuous want of appreciation of official propriety. If the grand jury desired, there was no reason why he should not testify. But he knew from the outset that, according to the charges made by Bennett, he was implicated in grossly wrongful conduct. Under these circumstances, he ought not to have presented the evidence himself. Bennett was a discredited witness because he was serving a sentence for connection with a robbery involving great moral turpitude. A proper presentation of his charges required that all the corroborative evidence should be produced from the lips of the witnesses so far as possible. Butler should have been called. If the wife of the convict was too ill to

be called, the person presenting the matter to the grand jury owed it to them to state fairly and fully the substance of her evidence or the nature of its corroborative effect. It is most unlikely that any grand jury, no matter what they may have thought of Bennett, would have declined to hear the evidence of Butler or of Mrs. Bennett or of Marston if they had had explained to them its substance and the vital point to which it was directed. If, however, the respondent had fully and fairly stated to the grand jury the substance of the statements given to him by Mrs. Bennett and Butler, and the grand jury had refused to listen, that would have been a different situation from that here disclosed. The respondent did not give to the grand jury any explanation of the nature of the evidence of Mrs. Bennett or of Butler. It is every day experience that the weight and credibility of evidence depends upon the appearance of witnesses and their manner of testifying. This matter should have been fairly presented to the grand jury. Butler and Marston should have been called as witnesses. Mrs. Bennett's statement to the respondent should have been summarized to them. The respondent failed in his duty in this particular. As to this specification we find that the charge is sustained.

14. It is alleged in paragraph 26 of the information that the respondent entered into a conspiracy with certain persons, who are not named, to secure the commission of crime by one Stearns in order to enable the wife of Stearns to obtain a divorce on the ground of adultery. The material facts are that Mr. and Mrs. Stearns had not lived happily for some years prior to 1918. In April of that year Mrs. Stearns consulted the respondent at the office of the district attorney in the court house at Cambridge. Mrs. Stearns was accompanied by her intimate friend, Mrs. Anna E. Brown. Both of them were acquainted with the respondent. At that consultation Mrs. Stearns narrated her marital difficulties and exhibited to the respondent certain letters and other evidence having a tendency to show intimacy on the part of her husband with other women or another woman. The respondent, on looking over all the material and listening to the statements of Mrs. Stearns, advised her that there was not evidence sufficient to prove adultery on the part of her husband or any other ground for divorce. She expressed a strong belief that his relations with other women were adulterous. The respondent thereupon in some form

of words suggested a scheme whereby the husband, a lifelong resident of Waltham but then a captain in the army of the United States, stationed at Fort Monroe, might be entrapped into committing adultery through the instrumentality of a harlot of attractive appearance who should go to a hotel near Fort Monroe and there entangle him in an unlawful intimacy, and that arrangements could be made for private detectives to be at hand at an appropriate moment to identify the husband under compromising circumstances. The expense of carrying out such a plan, the financial resources of Captain Stearns, the state of title of real estate of Mrs. Stearns and other matters were discussed. The respondent said that by reason of his official position as district attorney he could not undertake an affair of that sort and that his name must not be mentioned, although he might be of assistance by intimating to Captain Stearns, if he should be brought before him, that he was sorry but by making it worth while to his wife it would be all right. During the interview a man was called in, to whom the scheme was outlined. At the trial before us Mrs. Brown identified as that man Herbert Gordon of the Cambridge police force, for many years assigned for duty to the office of the district attorney at the Cambridge court house. Mrs. Stearns handed to the respondent a liberty bond of a small denomination, which was returned to her by him at a later time.

Soon after this interview with the respondent, Mrs. Stearns consulted Daniel H. Coakley, to whom reference already has been made. He examined the letters and other material previously shown to the respondent and advised her that it was not sufficient to warrant the granting of a divorce. In May, 1918, a woman from Boston, going under the name of Pennington, of attractive appearance, a stranger to Captain Stearns, made his acquaintance at or near Fort Monroe. She returned to Boston and was there in June. Correspondence indicating a considerable intimacy between them ensued and arrangements were made for a meeting in Boston on or about June 24, 1918, Captain Stearns coming home on a furlough at that time. She there took him to ride in her automobile. Ultimately they visited an apartment in Cambridge, where they were served with liquor by a female companion of the Pennington woman and were found together in a bedroom in scanty attire by two men who forthwith identified him from a

photograph in their possession as Captain Stearns, advised him to communicate with Daniel H. Coakley, said by them to be their employer, and departed. Captain Stearns in his deposition says that, although he did not know either of these men, the face of one of them was familiar to him about the court house in Middlesex County. After the men departed Stearns gave all the money he had with him to the Pennington woman, who appeared much disturbed, left the apartment and has never seen her since. A libel for divorce alleging adultery as the ground was very soon thereafter signed by Mrs. Stearns. Subsequently a libel was brought on the ground of cruel and abusive treatment and divorce was granted on that ground. Adjustment of financial affairs between Mrs. Stearns and Captain Stearns was made by agreement, whereby sums aggregating $40,000 or thereabouts, being about half his estate, were placed in trust and given outright for the benefit of Mrs. Stearns and a daughter. In all these matters Mr. Coakley was the attorney for Mrs. Stearns.

There was no substantial conflict of evidence as to these facts except upon two points.

*First.* Whether a scheme for entrapping Captain Stearns was outlined by the respondent at the interview between him and Mrs. Stearns in the presence of Mrs. Brown. That was denied by both the respondent in his testimony and by Mrs. Sewell, formerly Mrs. Stearns, in her deposition. Gordon denied in his testimony that he was called into such an interview. Whether the scheme was thus outlined by the respondent depends largely upon the testimony of Mrs. Brown. She appeared to us to be an entirely honest witness, intelligent, observant, and capable of repeating in oral statement with substantial accuracy the material facts of a conversation heard by her. She is disinterested. She was an intimate friend of Mrs. Stearns. She was invited by Mrs. Stearns to accompany her on her call on the respondent for that reason. In September following these events, her husband and herself being then occupants of a house of Mrs. Stearns, summary proceedings to recover possession were instituted by Mrs. Stearns. This event does not affect her credibility to our minds. Mrs. Brown did not impress us as a revengeful woman or one who would invent a story so wicked. It is in our opinion most unlikely that a woman such as she appeared to be upon the witness stand, both upon direct and cross-examination,

would fabricate a falsehood so malicious and atrocious in its bearing upon the character of the respondent, toward whom she had had no relations save those of acquaintance as fellow residents in a small city, and toward whom she had nothing but good will. Her testimony is confirmed by the subsequent events shown by the evidence. Precisely that, which, according to her testimony, was outlined by the respondent, took place so far as concerned Captain Stearns at Fort Monroe and his entrapment at Cambridge. A full written statement made by her under oath in December, 1918, of tenor similar to her testimony at the trial, was introduced in evidence. See *Commonwealth* v. *Tucker*, 189 Mass. 457, 481–485. The testimony of the respondent upon that point, to the effect that he said to Mrs. Stearns that if her husband had improper relations with other women it would be simple to have him watched and caught, affords no ground for believing that Mrs. Brown is mistaken. The differences between her testimony on the one side, and that of the respondent and the deposition of Mrs. Sewall, who was formerly Mrs. Stearns, upon this point, are direct, sharp, and irreconcilable. Mrs. Brown has not the slightest personal interest at stake in the issue of this proceeding; that of the respondent is profound; although in a lesser degree, that of Mrs. Sewall is very real. The testimony of Mrs. Brown is believed.

*Second.* The second point of conflict in the evidence is whether there is any connection in the nature of conspiracy between the scheme outlined at his conference with Mrs. Stearns in the presence of Mrs. Brown and that which thereafter actually transpired. There is no evidence to show that the respondent himself managed the execution of the plan. Manifestly Mrs. Stearns could not have accomplished it. The execution of such a scheme required an intelligent and unscrupulous mind. It necessitated the co-operation of several persons, or the co-ordination of the actions of several persons under the domination of one resourceful director. Such a train of circumstances would not arise by chance. The two men who appeared where Captain Stearns and the so called Pennington woman were found could not have gained access to the bedroom without forewarning or having their approach heralded in some fashion except by the co-operation of the Pennington woman and her female companion. Participants in an adulterous adventure ordinarily do not leave doors unsecured or unguarded.

So far as the outward manifestations of that scheme were designed to affect Captain Stearns, his testimony supports the inference that the plan outlined by the respondent was carried into execution.

Mr. Coakley testified that he made a contract with Mrs. Stearns to undertake her divorce case and to receive as his compensation one third of whatever sum might be recovered in way of alimony from Captain Stearns, although he finally took as his fee a sum substantially less; that he employed one Horgan, a detective whom he paid by cash and not by check, to cause Captain Stearns to be watched in the neighborhood of Boston when advised by Mrs. Stearns that her husband was home on a furlough in June, 1918; that the discovery in the Cambridge apartment was simply the result of that employment; that he never employed or caused to be employed in this connection any woman, and that he never knew or heard of the Pennington woman. He testified that Horgan reported to him in substance that he watched the movements of Captain Stearns in Waltham on the morning of the day when he was found with the woman in the Cambridge bedroom; that after Captain Stearns and the woman had driven about for a time, and after being in the dining room of a Boston hotel had started toward Cambridge, " Horgan followed them in his machine. . . . Sometime later the two detectives, Horgan and his man, went into the apartment under the guise of telephone men and discovered Captain Stearns and the woman."

It was shown by other evidence and we find that the same Horgan, referred to in the testimony of Mr. Coakley as the detective employed by him, was for two weeks in the middle or last part of May, 1918, in a hospital known as St. Gabriel's Monastery for rest, and from June 15 to July 1, 1918, was in St. Elizabeth's Hospital for treatment. From the time of leaving one and entering the other hospital he was at home and was not engaged in any occupation during that interval. Horgan did not testify before us, having died in 1920. It was impossible for him truthfully to have made a report such as that attributed to him. The evidence was convincing to the effect that a woman going under the name of Pennington was in Cambridge in the spring of 1918, that she took a lease of a tenement, that she made a contract for a telephone not to be published in the telephone directory, that she

signed the garage book in the garage where an automobile used by her was kept, that these signatures were written by the same hand which penned a letter mailed in Boston on June 13, 1918, and addressed to and received by Captain Stearns at Fort Monroe, and that the same woman under the name of Pennington on or about July 1, 1918, took to another garage to be kept as her own an automobile corresponding in description to the one in which Captain Stearns was taken to ride on June 24, 1918. We find that this Pennington woman was the one with whom Captain Stearns was on June 24, 1918, that she was employed by some one to trap Captain Stearns, and that Horgan did not follow the Pennington woman and Captain Stearns on the morning of June 24 from Waltham on their ride to the dining room of the Boston hotel and thence to the apartment in Cambridge where they were found. Upon a weighing of all the evidence and giving adequate consideration to the circumstances connecting Captain Stearns with such an affair as affecting his credibility, we find that within a comparatively short time after the conversation in April, 1918, between the respondent and Mrs. Brown, the Pennington woman, then a stranger to Captain Stearns, obtruded herself upon his attention at Fort Monroe, ingratiated herself into his favor and stimulated his lust to carnal fruition at the apartment in Cambridge on June 24, 1918, which was interrupted by the appearance of the two men, all this being done with the deliberate purpose according to a premeditated design to ensnare Captain Stearns in adulterous conduct in aid of securing a divorce for Mrs. Stearns. We find, therefore, on all the evidence that the respondent is guilty as charged in paragraph 26 of the information.

15. It is charged in paragraph 27 of the information that the respondent failed to prosecute Captain Stearns for adultery known by him to have been committed in Middlesex County. No evidence has been presented to support this charge beyond that already narrated in substance in connection with the preceding charge. There is nothing to indicate that the respondent knew the place where or the time when the crime was committed. His guilt of the charge in paragraph 26 of the information does not involve such knowledge. We find the respondent not guilty on this charge.

16. It is charged in paragraph 28 that the respondent failed to prosecute one Chambers accused of having committed adultery

in Middlesex County, because Chambers was either a client of himself or his partners in the practice of his profession. Without going into the details of the evidence on this charge, we find the respondent not guilty.

17. It is charged in paragraph 29 of the information that the respondent has maintained an office in Boston in partnership with two other members of the bar and has personally and by members of his firm defended criminal cases whereby he has received emoluments. This charge was supported and not denied by the testimony of the respondent and by that of his two partners. The relations between the three constitute a genuine partnership, where the respondent, if he has not already, ultimately will, share in all its profits from whatever source derived. The arrangement is not a case of verbal form of apparent partnership, where each is in truth conducting the independent practice of his profession; nor is it the employment of one or more by the other or remaining seeming partners. The only instance when the respondent has acted in court for one accused of crime was where complaint was made against an intimate friend, the witnesses in his behalf being about to embark on a voyage by sea. The trial could not well be postponed. The respondent conducted the defence in a court of first instance outside the middle district. The defendant was acquitted. There have been several instances where one or the other of the partners of the respondent has acted as counsel for defendants in the State or federal courts, some of which have attracted public attention and have involved fees substantial in amount. There is no statute prohibiting such conduct by a district attorney. The provisions of G. L. c. 12, § 30, do not go so far as to forbid it. Nevertheless, a keen sense of official propriety would prevent one from engaging in such practice. There is a certain want of decorum in a district attorney undertaking the defence of those charged with crime even outside his own district, or in sharing in the profits of such defence by those who are his partners. Where the partnership is merely ostensible and not real, the situation might be different. The filing of a brief *amicus curiæ* by the district attorney of Suffolk county in *Commonwealth* v. *Kozlowsky*, 238 Mass. 379, stands upon a different footing. Permission to file that brief was granted by the court because of the exceptional issues raised in that case affecting the scope, power and dignity of the office of

district attorney in all districts under the Constitution and statutes. The argument of the *amicus curiæ* was required to be confined to that single point. That case rests upon its own uncommon circumstances and is not a precedent for anything beyond them.

18. It is charged in paragraph 30 of the information and in the specifications thereunder that the respondent paid sums of money to persons insisting that defendants under indictment be brought to trial. George T. Perry, J. M. Barry and Daniel K. Collamore were indicted for offences in connection with the thefts of automobiles. The respondent, in conference with one of his assistants, decided (for reasons which are not found to be tainted with corruption and which need not be narrated) not to bring these defendants to trial upon agreement by their counsel that reparation should be made to the persons found by the assistant to have suffered in Middlesex County pecuniary damage in connection with the stolen automobiles with which these defendants had had dealings. Certain sums of money were paid to and disbursed by or under the direction of the respondent to persons who had thus sustained damage. These facts appear to be the only basis for this charge. The attorney for these defendants did not testify to the point whether he paid these moneys to the respondent, nor did any one else. Reparation in case of theft or criminal damage is important and desirable. It constitutes, for example, an important and salutary part of the work of probation officers. It is not the function of a district attorney. The plan of having the district attorney or any one connected with his office handle money under such circumstances is a vicious one. It ought not to be adopted. It is bound to be a fruitful source of suspicion and trouble. This is no part of the duties of a district attorney and is incompatible with the appearance of absolute purity in all financial matters, which ought always to be the fact and the reputation concerning the occupant of that office. It is the plain purpose of G. L. c. 12, § 29, re-enacting R. L. c. 7, § 20, to prevent any reasonable possibility of such suspicion by providing that all moneys received by a district attorney by virtue of his office shall be accounted for with the State treasurer. Nevertheless, the respondent is found not guilty on this charge.

19. It is averred in paragraph 31 of the information that the

respondent from improper and unlawful motives has delayed the prosecution of certain defendants although urged to do so by the complainant, and where evidence sufficient for conviction has been ready to his hand. The specifications under this paragraph have been considered in connection with other charges and nothing further need be said concerning them.

20. The allegation in paragraph 32 of the information relates to the conduct of the respondent in connection with the indictment against one Thomas Mozette. The evidence before us tended to show that by barefaced fraud Mozette secured possession of substantially all the property of a woman named Gordon, amounting to something more than $11,000. He fled immediately. He was indicted in 1917. He was then a fugitive from justice and his whereabouts were unknown to the officers. Indictments against Mozette were found in Suffolk County for comparatively small offences. Through the activity of Boston officers Mozette was located in Akron, Ohio, where he was apprehended late in February, 1920, and held for requisition as a fugitive from justice on one of the indictments for a small offence pending in the county of Suffolk. He secured bail, then defaulted, and is still at large in a place unknown to the officers of the Commonwealth. Information of the arrest was brought to the attention of the respondent. He made no efforts to have Mozette held on the indictment found in 1917. That indictment was nolprossed at about the same time. No new indictment has been found and no effort made by the respondent to have one found.

In January, 1919, the decision in *Commonwealth* v. *Harris*, 231 Mass. 584, was rendered, to the effect that strangers, except the witness under examination, ought not to be in the grand jury room during its hearings. That rule had been violated in presenting the evidence on which the indictment against Mozette had been found. The decision in *Lebowitch, petitioner*, 235 Mass. 357, following *Commonwealth* v. *Tucker*, 189 Mass. 457, to the effect that such an indictment was not void, that advantage of it could be taken only by plea in abatement and that the irregularity would be waived by a general plea, was rendered on March 30, 1920. Even if the indictment ought to have been nolprossed by reason of the decision in *Commonwealth* v. *Harris*, a new indictment ought forthwith to have been found and the old one held for what-

ever validity it possessed until the grand jury could pass upon the question of presenting a new indictment free from that infirmity. In reply to a letter from the attorney for the defrauded woman, the respondent wrote that the reasons for the nolprossing were (1) that the complainant had testified differently on two different occasions, (2) that he had lost confidence in the officer in charge of the prosecution, and (3) that Mozette had been apprehended for Suffolk County and he decided to let Suffolk County " do the prosecuting." These reasons are insubstantial. There could be no doubt about the gross nature of the fraud perpetrated upon Mrs. Gordon. Her contradictory statements could not wipe out or seriously affect that crucial fact. Loss of confidence by the respondent in a police officer who happened to have charge of the case was no reason why a larceny of the magnitude and kind charged in the indictment should go unpunished. The comparatively trifling offences for which indictments were found in Suffolk County manifestly constituted no reason why the serious crime committed in Middlesex County should not be prosecuted or the prisoner be permitted to escape in Ohio. The circumstance that this case was at some time before its final disposition turned over to an assistant does not relieve the respondent from responsibility. He knew all the facts and wrote the letter already referred to after the indictment had been nolprossed.

We find that there has been dereliction of duty in connection with this case on the part of the respondent.

21. It is alleged in substance in paragraph 15 of the specifications that the respondent conspired with Harry E. Levenson and William J. Corcoran, both attorneys at law, and with Herbert Gordon, captain of police of Cambridge, to extort money from the International Service Company, Incorporated, a Massachusetts corporation, and some of its officers, and that pursuant thereto, by making and inducing threats of criminal prosecution did through menace and fear thus exerted cause the payment by them of $7,500 to said Levenson. The facts respecting this charge are found to be that the International Service Company, Incorporated, was organized as a Massachusetts trading corporation in 1919. A small amount of the capital stock was issued at the outset for cash. The business in which it engaged was holding the equity in real estate and lending money on second mortgages and on other notes

and securities. The method by which it put out its capital stock in large part was to sell it in small amounts to a large number of people, in manufacturing cities, of different nationalities ignorant of our language through agents speaking their native tongue. The par value of the shares was $10, but they were sold at $15 per share. Of this sum a part was taken by the agents as commission for selling, a part for expenses, a part for division among the officers of the corporation. There was turned into the treasury of the corporation the par value of each share of the stock sold and in addition thereto a sum not definitely shown by the evidence but in no event more than $2.50 per share toward a surplus. There was evidence tending to show that the corporation issued and distributed advertisements indicating that it was conducting a banking business and calculated to make ignorant people believe that it was like a bank, that representations were made by agents to the purchasers of stock that if they needed the money back again at any time, it could somehow be gotten from the company, and that no full disclosure was made to purchasers of stock why stock of a par value of $10 per share should have an initial sale price of $15 per share. One agency or branch office of the company was at Lowell and complaints against this and other so called investment companies were made to the respondent. In the latter part of May, 1920, he directed Gordon to investigate the matter and also arranged with a young attorney in Lowell to make an investigation. Gordon visited the main office of the corporation in Boston and there met one Athans, who was its president and treasurer, and one Grant, a vice-president and director. All his questions were answered and no attempt at concealment of the business conducted or its methods was made. The officers immediately consulted L. W. Peters, an attorney who had acted for them in other matters. Mr. Peters forthwith went to the court house in Cambridge and, not finding the respondent, talked with one of his assistants, Mr. Wagner, who said that he knew nothing about the case, called in Gordon, and the three conferred. Mr. Peters, inquiring the nature of the charge against the company, was told by Gordon that it was a conspiracy to commit larceny and that the agents made misrepresentations in selling the stock. Mr. Peters assured him that that was contrary to the instructions of the company and its officers. Gordon said that he had no au-

thority and that the respondent, who would be at the court house the next day, must be seen. Mr. Peters returned the next day but the respondent was not there. Thereafter he wrote a courteous letter to the respondent reciting his effort to obtain an interview and his talk with Gordon and requesting an appointment at the convenience of the respondent, when he might bring some of the. officers of the company for a conference, adding that there was nothing to be concealed in their methods of doing business. A curt reply was sent to this letter that " Report of Captain Gordon seems to leave no course open except presentation of facts of investigation to Grand Jury." At that time Gordon on his testimony before us had made no adequate investigation. The officers of the corporation then consulted Harry E. Levenson, who with them interviewed the respondent. The latter listened in part to their statement and told them that the matter had been placed in the hands of Mr. Wagner. They did not meet Mr. Wagner because he was out. Mr. Wagner testified that he had no memory of an interview with Harry E. Levenson, while the latter testified that he had such an interview wherein Mr. Wagner said in substance that the officers of the corporation were not telling the truth, and that Gordon was insistent that the matter must be presented to the grand jury. Subpoenas were issued to some of the officers and agents of the corporation to appear before the grand jury. Then the officers of the corporation retained Mr. Corcoran, who demanded and was paid by them through Mr. Levenson $7,500. At his request consideration of the matter by the grand jury was postponed for a few days and then by reason of an accident to him, until September. The chief of police of Lowell wrote a letter commendatory of the Lowell agent of the corporation. Mr. Corcoran promised that advertising matter referring to banking business would be withdrawn and that any stockholders who were dissatisfied might get their money back, though it does not appear that any stockholder ever made demand. The matter never was presented to the grand jury.

The conduct of the respondent in this matter is open to suspicion. It is not in accordance with the standard which ought to be followed by a district attorney. Mr. Peters appears to have been a reputable attorney. The contrary has not been suggested. Although approaching the matter in an entirely proper way and

spirit, his request for an interview was denied by the respondent. No intimation could be plainer than the correspondence between him and the respondent to the effect that, no matter what facts he might be able to show by full disclosure of everything known to the officers of the corporation, indictments would be sought. When Mr. Corcoran came into the case he was accorded an entirely different reception. This is a case where the respondent knew about the case and is responsible for the conduct of his assistant. No change occurred in the facts affecting the guilt or innocence of the officers of the corporation or the knowledge of them on the part of the district attorney's office. The respondent ought not to have made threats of a grand jury investigation until he actually intended to have such an investigation. He ought to treat all members of the bar of good standing on an equal footing and not turn a deaf ear to some and make it easy for another to secure his indulgence concerning precisely the same matter. A threat of investigation of a given subject to one, followed by a choking of all inquiry on that subject on request of another is a perfect illustration of favoritism. When this is accompanied by the payment of a very large sum of money, ostensibly by way of fee to the attorney whose request is heeded, restiveness on the part of the right-minded cannot fail to be aroused. Justice is even-handed. It goes according to merit and not according to favoritism. It ought not to be necessary to say that a district attorney in the administration of his office is a minister of justice and should square all his conduct to her precepts. The evidence does not satisfy us that a conspiracy was formed and executed as alleged. But the respondent failed in the maintenance of the official standards which ought to prevail.

22. It is charged in paragraph 16 of the specifications that during the years 1919 and 1920 large numbers of cases appealed from police, district, and municipal courts, where fines or imprisonment or both had been there imposed, were in the Superior Court placed on file or the defendants released on probation on the recommendation of the respondent, or a *nolle prosequi* was entered by him, or sentences were imposed of much less severity than in the courts of first instance. In paragraph 17 of the specifications there are similar charges concerning complaints respecting the use and operation of motor vehicles. In paragraph 18 of the

specifications there are similar charges as to complaints for using automobiles without authority of their owners. In each paragraph the specifications as to numbers of cases and the aggregates of sentences and fines in the Superior Court, as compared with those in courts from which the appeals were taken, are impressive. In support of these charges tabulations and analyses of the records of the Superior Criminal Court for Middlesex County were offered. These were excluded on the ground that mere numbers of cases filed, or in which the defendant has been placed on probation or received a milder sentence than that imposed in the police, district, or municipal court, standing alone, without evidence of corruption, inefficiency, or want of regard for the public interest on the part of the respondent, have no probative force toward showing that the public good requires the removal of the respondent. The reason for this is that the imposition of sentence, the placing of a defendant upon probation, or the filing of a case, is the act of the court and not of the district attorney. Sentence, probation and filing each requires the exercise of the judicial faculty by the presiding judge. His oath of office requires that in every instance he be satisfied upon evidence or reliable representation made to him that the public interest requires the sentence, probation or filing before he can take such action. The representation of the district attorney is only one and not necessarily the decisive consideration which ought to move the mind of the court. During the trial suggestions were made indicating a somewhat wider use of power of filing cases by the courts than the established practice seems to recognize. *Commonwealth* v. *Dowdican's Bail,* 115 Mass. 133, 136. *Commonwealth* v. *Maloney,* 145 Mass. 205, 210. *Marks* v. *Wentworth,* 199 Mass. 44. That, however, has nothing to do with the charges against the respondent because, as already stated, the ordering of a criminal case to be placed on file is the act of the court and not of the district attorney.

If recommendations by the district attorney are not made honestly, or if for any reason he misleads the court in making such disposition, that would be a different matter. The charges in these paragraphs are not of that nature and rest upon mere numbers of cases.

The number of cases in which the respondent has entered a *nolle prosequi* stands on a different footing. A district attorney has

the absolute power to enter a *nolle prosequi* on his official responsibility without the approval or intervention of the court. He alone is answerable for the exercise of his discretion in this particular. His action is final. *Lizotte* v. *Dloska*, 200 Mass. 327, 329. *Commonwealth* v. *Wakelin*, 230 Mass. 567, 572. *Commonwealth* v. *Wheeler*, 2 Mass. 172, 174. *Commonwealth* v. *Tuck*, 20 Pick. 356, 365. *Commonwealth* v. *Smith*, 98 Mass. 10. *Commonwealth* v. *Cain*, 102 Mass. 487, 489. *Commonwealth* v. *Scott*, 121 Mass. 33. *Commonwealth* v. *McCormick*, 130 Mass. 61. *The Queen* v. *Allen*, 1 B. & S. 850, 854. *The Queen* v. *Comptroller-General of Patents, Designs & Trade Marks*, [1899] 1 Q. B. 909, 914. It is not necessary to inquire whether the court might interfere in case of scandalous abuse of the power. See *State* v. *Tufts*, 56 N. H. 137. Therefore, such disposition of a disproportionate number of complaints or indictments may have probative force on the ultimate question to be decided. No intimation was made as to the weight of such evidence or its evidentiary value without further facts tending to show bad judgment, want of good faith, corruption or inefficiency. Under this ruling evidence was introduced as to the number of instances of the entry of *nolle prosequi* in each of the years of the respondent's official term. In the year 1920 the number seems large, but there was evidence uncontradicted to the effect that this was due to advice from a Special Assistant Attorney General. We find the respondent not guilty of the charges in these three paragraphs.

As to other charges and specifications, if any, not herein particularized by name, we find the respondent not guilty.

The charges, the facts found and the conclusions drawn have been stated at length. All the material circumstances have been taken into account. Full weight has been given to the fact that a district attorney is constantly prosecuting criminals and those charged with crime. Hatred and malice against him can readily be engendered and nourished. He is a conspicuous mark for attack from the vicious, the depraved and the mendacious. These and other related factors naturally and inevitably lead to exacting scrutiny of accusations of corruption or maladministration in his office. Denunciations of wrongdoing against him are met by all the presumptions of uprightness and rectitude which commonly characterize the conduct of men in public station. We are con-

strained by the compelling nature of the evidence to make the findings which have been stated.

These findings of fact make clear beyond doubt that the character and the official conduct of the respondent render him unfit to hold longer the office of district attorney. No further discussion is required to demonstrate that in view of these findings "sufficient cause" is shown for the removal of the respondent from office as district attorney and that "the public good so requires."

The following order is made:

Now on this first day of October, in the year of our Lord one thousand nine hundred and twenty-one, by and before a majority of the Justices of the Supreme Judicial Court, namely, Arthur P. Rugg, Chief Justice, and Henry K. Braley, John C. Crosby, James B. Carroll and Charles F. Jenney, Associate Justices, upon the information brought by the Attorney General of the Commonwealth against Nathan A. Tufts, after hearing all the relevant evidence offered on behalf of those interested herein, and listening to arguments, and after due deliberation and consideration, and all and singular the premises being seen and understood, and it being made to appear to said court that certain of the allegations of said information are proved to be true as set forth in the judgment filed, and that sufficient cause is shown for the removal of said Nathan A. Tufts from the office of District Attorney for the Northern District, and that the public good requires said removal, therefore it is considered by said court, all of said Justices concurring and they being a majority of the Justices of said court, that the said Nathan A. Tufts do not in any manner concern himself further about the holding of or exercising the said office of District Attorney for the Northern District, but that he be and is hereby removed therefrom, and forejudged and excluded from holding or exercising the said office.